J. TONY SERRA, #32639
BRIAN GREGORY, SBN #284673
506 Broadway
San Francisco CA 94133
Telephone: 415/986-5591

Attorneys for Defendant
LESHAWN LAWSON

RECEIVED
U.S. ATTORNEY'S OFFICE
OAKLAND, CALIFORNIA
2015 OCT 15 AM 9:32

RECEIVED
OCT 15 2015
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>LESHAWN LAWSON,<br><br>    Defendant.<br>_____/ | CR 15-00119 PJH<br><br>**NOTICE OF MOTION AND MOTION TO SUPPRESS INCRIMINATING STATEMENTS AND THE FRUITS THEREOF.**<br><br>Date: December 9, 2015<br>Time: 1:30 P.M.<br>Judge Hamilton |

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that on December 9, 2015, at 1:30 p.m. or a soon thereafter as the matter may be heard before this Court, Defendant LESHAWN LAWSON, by and through counsel, will and hereby does move this Court for its order excluding all evidence of statements made by him to law enforcement after his arrest on February 6, 2015, and the fruits thereof.

This motion is made on the grounds that the statements were obtained in violation of Defendant's privilege against self-incrimination and the right to assistance of counsel, as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

Defendant hereby requests that the Court conduct an evidentiary hearing as necessary to resolve the issues raised by this motion and that the Court order production of all witness statements pursuant to Rule 26.2 and Rule 12(I) of the Federal Rules of Criminal Procedure.

Dated: October 14, 2015

/s/ J. TONY SERRA
J. TONY SERRA
BRIAN GREGORY
Attorneys for Defendant
LESHAWN LAWSON

## STATEMENT OF FACTS

On February 6, 2015, Leshawn Lawson was arrested in Livermore, CA, as the result of a traffic stop and warrantless search of his vehicle and person. Livermore Police officers and agents from the Drug Enforcement Agency (DEA) are believed to have taken part in the arrest. No audio or video recordings of the arrest exist, with the exception of a Livermore Police CAD Dispatch tape.

At approximately 9:30 a.m., Lawson, an African-American male, was traveling westbound in the left lane of interstate 580 in a white 2006 Bentley Flying Spur. DEA agents had previously installed a GPS tracking device on Lawson's vehicle, and they were maintaining "mobile surveillance" on him.

Livermore Police officer Matthew Williams entered the freeway behind Lawson from Northfront Road, and observed Lawson's vehicle "without any license plate," and traveling faster than the flow of traffic. Williams paced the vehicle at approximately 75 mph in a 55 mph zone before pulling behind the vehicle and pulling it over. Williams claimed that he could not see any temporary registration because of the dark tint on the windows, but the report-of-sale paperwork permitting lawful operation of the vehicle was affixed to the lower-right corner of the front windshield, per California Vehicle Code § 4456. Williams radioed the stop in to dispatch as a "no plate."

When Williams first contacted Lawson, he immediately ordered Lawson to hand over his keys and to roll down all of his windows. Lawson complied. Williams called in a probation check, and dispatch reported that Lawson was not on probation. While

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

3

1  Williams ran the probation check, Livermore Police Detective
2  Albert Grejada arrived on scene.
3      Williams then began extensive questioning of Lawson.
4  Williams asked about where he was coming from. Lawson replied
5  that he was returning to Hayward from Los Angeles. Williams
6  asked what Lawson was doing in Los Angeles, and Lawson replied
7  that he worked as an entertainer in the clubs in L.A. and as an
8  iron worker in the Bay Area. Williams asked Lawson how long he
9  was in L.A., and Lawson replied that he was there for three
10 weeks. After looking around in the interior of the vehicle,
11 Williams told Lawson that he did not see any luggage. Lawson
12 point to a duffle bag in the back seat and said that he did not
13 take much with him. Williams commented on the Bentley, noting
14 that it was very clean and that Lawson must have paid a fortune
15 for it. Williams asked Lawson if he was on probation or parole,
16 and Lawson replied that he had not been in trouble in quite some
17 time. Williams asked if there was anything illegal in the
18 vehicle, and Lawson replied that he did not have anything
19 illegal on him.
20     Williams then directed Lawson to exit the vehicle and
21 Lawson complied. Williams searched Lawson and located a
22 substantial amount of cash Lawson's pockets. He then directed
23 Lawson to sit on the curb. Lawson complied. Williams and Grejada
24 then searched the interior of the vehicle and began taking
25 photos of the car. Williams searched the duffle bag in the back
26 seat and located clothes, a camera, and a large amount of cash.
27 At this point, approximately 20 minutes had elapsed from the
28 time of the stop.

1    Williams then asked Lawson how to open the trunk. Lawson
2 stated that there might be a button in the glove box. Williams
3 instead used Lawson's keys to open the trunk. In the trunk,
4 Williams located a second duffle bag. Williams opened the bag
5 and located three bundles wrapped in green saran wrap. Williams
6 asked how much there was and Lawson replied 10 kilos. Williams
7 then asked what it was and Lawson stated cocaine. Williams asked
8 where it came from and Lawson stated L.A. Lawson was not
9 Mirandized at any point during his road-side detention.
10    DEA responded to the scene and Williams transported Lawson
11 to the Livermore police station. While at the police station,
12 Williams continued to interact with Lawson. Lawson inquired
13 about his car and Williams reported that it had been impounded.[1]
14 Lawson inquired about bail and Williams replied that bail would
15 be set once Lawson was transferred to Santa Rita Jail. Lawson
16 then stated that he did not have any of his phone numbers or any
17 one to call because his phone numbers were all in his phone.
18 Williams replied by saying "before we get into your phone and
19 all that, let me read you something," and then read Lawson his
20 Miranda rights.
21    After reading Lawson his rights, Williams asked Lawson
22 "Having those rights in mind, do you wish to talk about that?"
23 When Lawson asked, "Talk about what?" Williams answered, "Your
24 cell phone and the incident and all that." Lawson stated,
25 "There's nothing to talk about." Williams then said, "Well, your

---

[1] The following summary of facts is taken from a recorded interrogation of Lawson by Williams discovered to the defense on a disc labeled "LAWSON-0292." The disc also contained 14 photos, sequentially labeled "F2615493" through "F2615506." The recorded interrogation is labeled "F2615508."

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

5

cell phone was in the car, and that's probably going to be taken as evidence." Then, without receiving any clear waiver from Lawson, Williams launched into investigative questioning.

Williams first asked, "So, you were coming from L.A., correct?" Lawson did not reply. Williams said, "Yes?" and Lawson replied, "Yes." Williams asked, "How long were you in L.A. for?" Lawson replied, "A couple of weeks." Williams asked, "You were going back to Hayward?" Lawson replied, "I was going to San Francisco." Williams then asked, "You live in Hayward, though?" Lawson replied that he lived in L.A. Williams stated, "You were going back and forth. What do you do for a living in L.A.?" Lawson replied, "I don't. I work for a living up here. Down there I work as an entertainer. My L.A. job is entertaining." Williams asked, "As far as?" and Lawson replied, "I book shows, the club thing." Williams then asks, "As far as here, you said you were an iron worker?" Lawson said, "Yeah, in San Francisco." Williams asked, "How long have you been doing that?" Lawson replied, "since '01." Williams then asked, "Have you done any state time yet, for anything?" Lawson did not reply.

Williams then began asking about Lawson about the case. Williams asked, "So, how much cash did you have in your car? In your duffle bag in the front seat? Do you know?" Lawson replied, "It was about 20, naw, about 15." Williams asked if the money was from Lawson's employment, and Lawson replied that it was from a show he had done the night before. Williams asked what company Lawson worked for, and Lawson replied Froggle, LLC.

Williams then said, "you realize you were speeding on the freeway, right? In a 55 miles-per-hour zone, the construction

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

6

1 zone." Lawson replied, "I don't know if I was speeding or not.
2 You say I was speeding, but I was just going with the flow of
3 traffic. I wasn't speeding. That's why I asked you at the top."
4 Williams replied, "Because I was behind you?" Lawson said, "No,
5 I saw you, when I came down I saw you get on the freeway, and
6 when you got behind the truck." Lawson continued, "I wasn't even
7 speeding, honestly. I was going with the flow of traffic because
8 there was cars in front of me. I wasn't by myself, I was in a
9 bunch of cars. I thought you were getting on the freeway to get
10 to another location, till you came and got me."
11      Williams then asked, "As far as, talking at the window, you
12 gave me consent to get into the car." Lawson replied, "Right, I
13 don't need this. I don't even, I'm not even, right now I'm so
14 pissed off right now, I don't even feel like going through none
15 of this right now. You know, seriously. Right now I've been
16 asking you off the top if I could get some phone numbers to call
17 my brother in L.A." Williams replied, "I'm trying to get those
18 phone numbers."
19      The interrogation then began to fall apart. Lawson
20 continued, "And you're not even, you know what I'm saying? And
21 I've been 100% with you--" Williams interrupted, "And I've been
22 with you, too." Lawson continued, "Since this incident I've been
23 trying to be cool, respectful, everything." Williams
24 acknowledged, "Correct. I'm trying to work with you." Lawson
25 replied, "I don't think you were, you weren't working with me.
26 I'm super cool--" Williams again interrupted, "I'm trying, but
27 you've got to be honest with me." Lawson replied, "I've been--
28 Stop. Just stop. I've been, I'm not even, no, no, no. I've been

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

1 honest with you from the beginning. You know that." Williams
2 replies, "Okay, no problem. I appreciate it. You're not giving
3 me any problems or anything--"
4     Lawson continues, "I don't even want to go into, I don't
5 even want to talk anymore. I'm tired, I'm mad, I don't want- I
6 just want you to send me to Santa Rita and let me get my bail.
7 I'll call my brother so he can fly up here and bail me out.
8 That's all I wanted."
9     Instead of discontinuing the interrogation, Williams then
10 asks, "How much dope was in the trunk?" Lawson says, "I don't
11 know, I'm not asking you--" Williams interrupts, "You don't
12 know?" Lawson replies, "No, I'm not even saying 'I don't know.'
13 I don't want to answer any questions, sir. Seriously."
14     Again, Williams persists. Williams states, "Well, I'm
15 trying to help you out." Lawson retorts, "Trying to help me
16 out?" Williams continues, "And this is the stuff we do--" Lawson
17 begins talking over Williams, "You're not helping me out."
18 Williams then asks, "But you're the owner of the car, right?"
19 Lawson continues, "Helping me out is getting, helping me out of
20 here." Williams replies, "I'm trying. The sooner we get this
21 done, the sooner I can get you to Santa Rita." Lawson says, "All
22 right, well let's go. I don't even got nothing else to say.
23 Honestly, man."
24     However, Williams continues to try to question. He begins
25 to ask, "Well at the scene--" Lawson interrupts him saying,
26 "Look, look. You were cool with me before. Let's leave it at
27 that. Let's leave it. I don't even want to talk. I don't. I
28 don't want to talk. I been telling you, I don't want to talk.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

We've done enough. I been sitting down here the last hour and a half--" Williams interrupts again, saying "And you can see me. I'm making calls and stuff about your cell phone and car and all that stuff. Fair?" Lawson does not reply.

But Williams continues, "So my thing is, if you're, I mean, I'm trying to help you out." Lawson says, "I don't know what you want. How are you helping me out?" Williams says, "Well, you know, it doesn't even matter--" Speaking over him, Lawson says, "How are you helping me out?" Williams continues, "It's a fact, you told me at the scene it was 10 kilos in the trunk. Now I'm just trying to make sure that's exactly, I mean, we haven't weighed it yet." Lawson says, "I'm not talking, I'm not agreeing to none of this. What, you got a microphone or something? You trying, why you trying to get me to say stuff?" Williams lies, "I'm not, I'm just trying to talk to you man to man." Lawson says, "I don't know nothing about that. I don't even want to talk. That's the first thing my lawyer going to tell me. Don't say shit."

Nonetheless, Williams then asks, "Okay, you have anything else to add?" Lawson says, "I don't have nothing to add. I don't want to talk, you know." Williams appears to understand this time, and says, "Fine. I'll be back to deal with you. Okay?" The recording ends.

ARGUMENT

In addition to the previous challenges Defendant has brought to law enforcement's actions in this case, Lawson moves independently to exclude statements obtained from him during custodial interrogations, in violation of <u>Miranda v. Arizona</u>,

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

384 U.S. 436 (1966). The government may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it can demonstrate the use of the procedural safeguards effective to secure the privilege against self-incrimination. *Id.*, at 444. An accused who is in custody must voluntarily waive his right to remain silent and to the assistance of counsel before any questioning takes place. *Id.*

> ...[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent....the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response....

Rhode Island v. Innis, 446 U.S. 291, 300-302 (1980).

Miranda recognized that custodial interrogation presents such a serious threat to the Fifth Amendment right against self-incrimination that police have a duty to warn suspects of their full panoply of rights regarding interrogation before any custodial interrogation begins. The government must establish compliance with Miranda before the statements can be admitted. *See* Orozco v. Texas, 394 U.S. 324 (1969).

In this case, there are two sets of statements subject to Miranda which Defendant seeks to exclude: (1) statements attributed to him at the scene of the traffic stop and warrantless search; and (2) statements attributed to him while in custody at the Livermore Police Station.

The government will not be able to establish compliance in this case, and therefore the statements attributed to Mr. Lawson are inadmissible.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

## II.

### DEFENDANT'S STATEMENTS AT THE SCENE OF THE TRAFFIC MUST BE SUPPRESSED BECAUSE THEY ARE THE RESULT OF A CUSTODIAL INTERROGATION WITHOUT MIRANDA WARNINGS.

In the first instance, Defendant moves to exclude statements attributed to him at the scene of the traffic stop. <u>Miranda</u> broadly requires only that the interrogation be custodial before the advisement applies. In this instance, it is undisputed that Lawson was not advised of his rights at the stop, so the only question is at what point he was in custody.

Generally, a traffic stop is a detention, and does not implicate the greater constitutional protections afforded during an arrest. *See* <u>Rodriguez v. United States</u>, 135 S.Ct. 1609 (2015), *quoting* <u>Knowles v. Iowa</u>, 525 U.S. 113, 117 (1998). If the circumstances indicate that a reasonable person in the defendant's position would not feel free to decline the officer's requests or otherwise terminate the encounter, then a detention has occurred. *See* <u>Florida v. Bostick</u>, 501 U.S. 439, 434 (1991). While police may approach an individual in a public place to elicit voluntary information, any show of official authority such that the citizen's freedom of movement is restrained amounts to a detention for Fourth Amendment analysis. *See* <u>United States v. Mendenhall</u>, 446 U.S. 544, 553 (1980). Stopping an individual for the purpose of obtaining identification constitutes a seizure of the person within the meaning of the Fourth Amendment. *See* <u>Brown v. Texas</u>, 443 U.S. 47, 50 (1979).

Undoubtedly, the traffic stop at its inception was a

detention by definition. However, "detention for custodial interrogation--regardless of its label--intrudes so severely on the interests protected by the Fourth Amendment as necessarily to trigger the safeguards against illegal arrest." Dunaway v. New York, 442 U.S. 200, 216 (1979). The length of the detention can transform a Terry stop into a de facto arrest, requiring probable cause. See Terry v. Ohio, 392 U.S. 1 (1968); see also Dunaway, 442 U.S. at 216. "In assessing the effect of the length of the detention, we take into account whether the police diligently pursued their investigation." See Florida v. Royer, 460 U.S. 491, 500 (1983). If an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. United States v. Sharpe, 470 U.S. 675 (1985).

As indicated in Defendant's Motion to Suppress the Evidence from Unlawful Stop and Prolonged Detention, at p. 10-15, the traffic stop at issue was unjustifiably transformed into a de facto arrest when Officer Williams unlawfully prolonged the detention. Defendant incorporates those arguments herein by reference.

Specifically, even assuming *arguendo* that Officer Williams possessed a reasonable suspicion to stop Lawson (he did not), Officer Williams extended the stop beyond its constitutionally permissible scope when, after confirming Lawson was not on probation or parole and after failing to issue a citation for speeding or "no plates," Officer Williams launched into an unrelated interrogation. Specifically, Williams interrogated Lawson on his travels, his employment, his luggage, and his

1  vehicle. Because of the unlawful prolonging of the detention,
2  this questioning and the statements resulting therefrom are in
3  violation of <u>Miranda</u>, and must be excluded.
4      After those questions failed to yield incriminating
5  information, Officer Williams ordered Lawson from the vehicle
6  and made him sit on the curb while Detective Al Grejada stood
7  over him. At this point, the fact that Lawson was the subject of
8  a de facto arrest is all the more apparent because of the
9  overbearing show of authority and coercive nature of Officer
10 Williams' and Detective Grejada's actions. Officer Williams then
11 conducted a warrantless search, rifling through Lawson's
12 belongings as he watched helplessly, and discovered a large sum
13 of money and several kilograms of cocaine. Again without
14 advising Lawson of his rights, Williams queried Lawson about the
15 cocaine and received incriminating responses. These responses
16 must also be excluded.
17     The government will no doubt argue, despite any credible
18 evidence to prove it, that Lawson consented. Lawson adamantly
19 denies ever having consented. However, even assuming *arguendo*
20 that he had, any consent would not be voluntary, but rather
21 "acquiescence to a claim of lawful authority." See <u>Bumper v.</u>
22 <u>North Carolina</u> (1968) 391 U.S. 543. It must be observed that at
23 the inception of the stop, in a show of authority, Officer
24 Williams ordered Lawson to hand over his keys and roll down his
25 windows. Throughout the stop, Lawson acquiesced to Officer
26 Williams' authority, despite knowing that he was not speeding
27 and there was no lawful basis for the stop. Thus, all alleged
28 statements are the product of duress and coercion.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

Additionally, even if Lawson had consented, the "consent" would be the tainted fruit of the preceding unlawful detention. For example, consent following an illegal entry, detention, arrest, or frisk is invalid. See Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971) (illegal entry vitiates subsequent search or seizure).

Therefore, the statements obtained from Lawson at the scene of the traffic stop were obtained in violation of Miranda and must be excluded.

## II.

### DEFENDANT'S STATEMENTS TAKEN AT THE STATION MUST BE SUPPRESSED BECAUSE THEY WERE THE PRODUCT OF A COERCIVE IN-CUSTODY INTERROGATION, AND HE DID NOT WAIVE HIS RIGHTS.

In the second instance, Lawson was interrogated against his will and despite his repeated invocation of his right to remain silent, while in custody at the Livermore Police Station. Thus, the question is not his custodial status, but rather whether his statements were freely given or were involuntarily coerced. Miranda, 384 U.S. at 444.

Statements obtained from suspects by law enforcement are inadmissible if found to be involuntary. See Schenckloth v. Bustamonte, 412 U.S. 218, 225 (1973). Any statement obtained by police through coercion is considered involuntary, and therefore inadmissible. See Colorado v. Connelly, 479 U.S. 157, 167 (1986). Sometimes, an implied waiver can be found where a suspect, having a "full understanding of his or her rights," thereafter answered the officer's questions. Berghuis v. Thompkins, 130 S.Ct. 2250, 2263 (2010). Nonetheless, saying

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

nothing in response to questions or unambiguously invoking the <u>Miranda</u> rights will give cause to cease the interrogation. <u>Berghuis</u>, 130 S. Ct. At 2263.

In this instance, Officer Williams read Lawson his <u>Miranda</u> rights, and asked him for a waiver. Specifically, After reading Lawson his rights, Williams asked Lawson "Having those rights in mind, do you wish to talk about that?" When Lawson asked, "Talk about what?" Williams answered, "Your cell phone and the incident and all that." Lawson stated, "There's nothing to talk about."

The statement "There's nothing to talk about," in response to Officer Williams request for a waiver should amount to a clear and unambiguous invocation of <u>Miranda</u>. Nonetheless, Officer Williams persisted in asking questions, engaging in a "softening" tactic of asking innocuous questions about Lawson's traveling to Los Angeles and work. However, this was not Lawson's final explicit and unambiguous invocation of his <u>Miranda</u> rights.

After a series of "soft" questions, Lawson invoked again when Williams began to approach the specifics of the case. Williams asked, "As far as, talking at the window, you gave me consent to get into the car." Lawson replied, "Right, I don't need this. I don't even, I'm not even, right now I'm so pissed off right now, I don't even feel like going through none of this right now. You know, seriously. Right now I've been asking you off the top if I could get some phone numbers to call my brother in L.A." Even though this response by Lawson was a clear

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

invocation of his rights, Williams persists with investigative questioning.

After a short exchange, Lawson again invokes, stating, "I don't even want to go into, I don't even want to talk anymore. I'm tired, I'm mad, I don't want- I just want you to send me to Santa Rita and let me get my bail. I'll call my brother so he can fly up here and bail me out. That's all I wanted." Again, Williams persists.

Williams asks, "How much dope was in the trunk?" Lawson says, "I don't know, I'm not asking you--" Williams interrupts, "You don't know?" Lawson replies, "No, I'm not even saying 'I don't know.' I don't want to answer any questions, sir. Seriously." Despite this fourth explicit and unambiguous invocation by Lawson, Williams still persists.

In fact, the progression of questions cumulatively becomes more and more coercive as Williams repeatedly ignores Lawson's invocation of his rights. At one point, Williams coercively states, "The sooner we get this done, the sooner I can get you to Santa Rita." Lawson says, "All right, well let's go. I don't even got nothing else to say. Honestly, man." Thus, a fifth invocation. Nonetheless, Williams persists.

Williams begins to ask, "Well at the scene--" Lawson interrupts him saying, "Look, look. You were cool with me before. Let's leave it at that. Let's leave it. I don't even want to talk. I don't. I don't want to talk. I been telling you, I don't want to talk. We've done enough. I been sitting down here the last hour and a half--" Williams interrupts again, saying "And you can see me. I'm making calls and stuff about

AW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
ax: (415) 421-1331

your cell phone and car and all that stuff. Fair?" Lawson does not reply. Thus, here, we have a sixth emphatically clear invocation of rights, and then a refusal to answer questions. But that won't stop Officer Williams from continuing to question.

Again, Williams attempts coercion, stating, "So my thing is, if you're, I mean, I'm trying to help you out," before getting to his question, "It's a fact, you told me at the scene it was 10 kilos in the trunk. Now I'm just trying to make sure that's exactly, I mean, we haven't weighed it yet." Again, Lawson emphatically invokes, saying, "I'm not talking, I'm not agreeing to none of this. What, you got a microphone or something? You trying, why you trying to get me to say stuff? ... I don't know nothing about that. I don't even want to talk. That's the first thing my lawyer going to tell me. Don't say shit."

In total, Defendant invoked his rights seven times, eight counting the instance where he sat in silence in response to Officer Williams' questions. It is hard to fathom where a waiver, express or implied, could be found in this exchange. Certainly, the coercive nature of Officer Williams' overbearing techniques cannot be ignored.

Therefore, because Lawson did not waive his rights, and instead emphatically, unambiguously, and repeatedly invoked them, his custodial statements coerced against his will must be excluded.

/

/

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331

## CONCLUSION

For the aforementioned reasons, Defendant moves this Court to exclude from evidence his statements taken in violation of Miranda.

Dated: October 14, 2015

/s/ J. TONY SERRA
J. TONY SERRA
BRIAN GREGORY
Attorneys for Defendant
LESHAWN LAWSON

## CERTIFICATE OF SERVICE

I, Brian Gregory, hereby certify that I filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on October 14, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: October 14, 2015

                                         /s/ Brian Gregory
                                         BRIAN GREGORY

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
(415) 986-5591
Fax: (415) 421-1331