1

2

3

4                                    UNITED STATES DISTRICT COURT

5                                  NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,

8                            Plaintiff,              Case No.  15-cr-00119-PJH-1

9           v.                                       **ORDER ON DEFENDANT'S MOTIONS**

10   LESHAWN LAWSON,                                  Doc. nos. 39, 40, 41, 42, 43, 44, 45

11                           Defendant.

12

13

14          On February 3, 2016, this matter came on for hearing on the following motions

15   filed by defendant LeShawn Lawson: motions to suppress evidence obtained pursuant to

16   warrants authorizing the installation of GPS tracking devices on a Captiva (doc. no. 39),

17   Equinox (doc no. 40), and Bentley (doc. no. 42); motion to suppress evidence obtained

18   pursuant to warrant to search a UPS package (doc. no. 41); motion to suppress evidence

19   from unlawful stop and prolonged detention (doc. no. 43); motion to suppress

20   incriminating statements (doc. no. 44); motion for an order requiring disclosure of

21   identities of confidential sources and informants (doc. no. 45).

22          Having read the parties' papers and carefully considered their arguments and the

23   relevant legal authority, and for the reasons stated on the record and set forth below, the

24   court DENIES the motions to suppress evidence obtained pursuant to the warrants

25   authorizing GPS tracking devices and parcel search; and DENIES the motion for

26   disclosure of confidential sources and informants.  The court GRANTS IN PART

27   defendant's request for an evidentiary hearing on certain issues raised by the motion to

28   suppress based on unlawful stop and prolonged detention and the motion to suppress

incriminating statements; DEFERS RULING on those limited issues as further discussed below; and otherwise DENIES IN PART those motions.

## I.    Background

In a single count indictment, defendant LeShawn Lawson is charged with one count of violation of 21 U.S.C. § 841(a)(1) for possession with intent to distribute cocaine. Doc. no. 5.  Defendant moves to suppress evidence seized pursuant to four separate warrants issued during the course of the investigation, starting in October 2014, that led to his arrest.  He also seeks to compel disclosure of the identities of the confidential informants (CI) and sources of information (SOI) who provided information relied upon in the probable cause affidavits.  He further challenges the admissibility of incriminating statements and evidence obtained during the traffic stop leading to his arrest on February 6, 2015.

### A.    Captiva Warrant

On October 22, 2014, the Cincinnati Police Department obtained a warrant to install a GPS tracker on defendant's rental car, a red 2015 Chevrolet Captiva, when he visited Ohio.  Police officer Ryan Robertson submitted an affidavit in support of the warrant application, summarizing information obtained from Task Force Officer (TFO) Ken Baker of the Drug Enforcement Administration (DEA) during the course of an ongoing investigation of defendant for drug trafficking.  Consolidated Opp. Mots. Suppress Search Warrants (doc. no. 52) ("Consolidated Opp."), Ex. E at LAWSON 0272-0273 ("Captiva affidavit").  Based on his training and experience, Officer Robertson stated that drug traffickers utilize rental vehicles to store, maintain and transport narcotics and/or proceeds, and believed that Lawson was involved in interstate distribution of marijuana.  *Id.*  On October 22, 2014, at 9:45, the Hamilton County Municipal Court issued a search warrant to install a covert GPS device on the Captiva.  *Id.* at LAWSON 0274 ("Captiva warrant").  The search warrant return, including information on a CD, was filed October 23, 2014.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### B.    Equinox Warrant

On December 3, 2014, the Cincinnati police obtained a search warrant to install a GPS tracker on defendant's rental car while he was visiting Cincinnati, a red 2015 Chevrolet Equinox. Officer Robertson's Equinox affidavit repeated the background facts asserted in the Captiva affidavit, and added information based on surveillance of defendant on October 22, 2014 leading up to the date of the Equinox affidavit. Consolidated Opp. (doc. no. 52), Ex. D at LAWSON-0287 ("Equinox affidavit"). The Hamilton County Municipal Court issued the Equinox GPS warrant on December 3, 2014 at 9:28 am ("Equinox warrant"). The search warrant return was filed December 4, 2014.

### C.    UPS Parcel Warrant

Using the GPS tracking device on the Equinox, law enforcement tracked defendant and observed him entering a UPS store to ship a package. Cincinnati police then used a canine to sniff the package, which indicated for drugs. On December 3, 2014, Officer Robertson applied for a search warrant for the package that defendant dropped off at the UPS store in Cincinnati. Consolidated Opp. (doc. no. 52), Ex. C at LAWSON 0277-278 ("UPS affidavit"). The municipal court issued the parcel warrant at 6:48 pm on December 3, 2014 ("UPS warrant"). Upon searching the UPS package pursuant to the UPS warrant on December 3, 2014, law enforcement discovered and seized $336,920 in cash from the package that defendant had shipped. No charges were filed.

### D.    Bentley GPS Tracking Warrant

On December 29, 2014, Magistrate Judge Bernard Zimmerman issued a tracking warrant to install a GPS tracker on defendant's 2006 white Bentley ("Bentley Warrant"), based on the supporting affidavit by DEA Agent Pettie Winston. Sealed Exhibit B to Consolidated Opp. ("Sealed Winston Affidavit"). This affidavit is sealed from the public record but has been provided to defense counsel. The Bentley warrant authorized agents to install the GPS tracking device within 10 days and to continue use for 45 days. Consolidated Opp. (doc. no. 52), Ex. A. Defendant represents that the DEA installed a

3

1    GPS tracking device on the Bentley on December 30, 2014, and again installed a GPS

2    device on January 23, 2015.  Mot. Suppress Bentley Warrant (doc. no. 42) at 12.

3        **E.    Traffic Stop**

4        During the evening of February 5, 2015, DEA agents observed that the tracker

5    data for the Bentley showed that defendant had traveled from the Bay Area to Los

6    Angeles.  Opp. Mot. Suppress Unlawful Traffic Stop, Ex. B (doc. no. 51) ("Winston Decl.")

7    ¶ 3.  On February 6, 2015, at about 7:15 a.m., DEA Agent Winston monitored the GPS

8    tracker data which indicated that defendant was driving back to the Bay Area from Los

9    Angeles.  *Id.* ¶ 4.  Agent Winston telephoned Livermore Police Detective Al Grejada,

10   informed him of the DEA's investigation of defendant and the active GPS tracker on

11   defendant's Bentley with a description of the Bentley, and requested that an officer from

12   the Livermore Police Department perform a traffic stop on the Bentley if it drove through

13   their jurisdiction.  *Id.*

14       On February 6, 2015, at about 8:30 a.m., Livermore Police Officer Matthew

15   Williams received a call from Detective Grejada, who informed Officer Williams of the

16   DEA investigation of defendant and asked him to perform a traffic stop on defendant's

17   Bentley if located while it passed through the Livermore area.  Opp. Mot. Suppress

18   Unlawful Traffic Stop, Ex. A (doc. no. 51) ("Williams Decl.") ¶ 2.  At about 9:30 a.m.,

19   Officer Williams observed a white Bentley traveling without any license plates on the

20   vehicle, in violation of California Vehicle Code § 5200, and traveling at approximately 75

21   MPH in a posted 55 MPH construction zone, in violation of Vehicle Code § 22349(a).

22   Opp. Mot. Suppress Unlawful Stop (doc. no. 51), Ex. A-1 (Arrest Report).  Officer

23   Williams pulled over the Bentley, driven by defendant, for a traffic stop.  With the Bentley

24   stopped, Officer Williams exited his patrol car and contacted defendant as he sat in the

25   driver's seat.  *Id.*  In a late-filed declaration, defendant states that Officer Williams

26   approached defendant's car with his hand on his gun, spoke in a commanding and

27   forceful tone, and ordered defendant to hand over the keys and roll down all the windows

28   of the vehicle.  Lawson Decl. (doc. no. 60) ¶ 9.

United States District Court
Northern District of California

1   As reported by Officer Williams, he asked defendant several questions while

2   holding a casual conversation.  According to the arrest report, Officer Williams asked

3   defendant if he would mind having his person and vehicle searched, and defendant

4   responded, "Go ahead, I don't have anything in my car."  Arrest Report (doc. no. 51) at

5   LAWSON-0031.  Defendant disputes that he ever gave anyone consent to enter or

6   search any part of his vehicle.  Lawson Decl. (doc. no. 60) ¶ 11.

7   Officer Williams requested another officer for back-up and asked defendant to step

8   out of the vehicle.  According to the arrest report, Officer Williams conducted a consent

9   search of defendant's person when he stepped out of the car.  Officer Williams located a

10   large amount of U.S. currency in defendant's right front pants pocket and left rear pants

11   pocket.  After searching defendant's person, Officer Williams asked him to walk to the

12   sidewalk and sit on the curb.  As Officer Williams was walking with defendant to the

13   sidewalk, Officer Grejada arrived on the scene.  Officer Williams then commenced a

14   search of the vehicle and searched the inside of a duffle bag on the front passenger seat

15   that contained a large amount of cash in $100 bills, as well as a camera and two cell

16   phones.  Arrest Report (doc. no. 51) at LAWSON-0031-0032.

17   Officer Williams reported that when he had finished searching the interior of the

18   vehicle, he asked defendant how to open the trunk, while holding the keys to the vehicle.

19   Officer Williams saw the trunk release on the key fob and pushed it to open the trunk,

20   where he found another duffle bag containing bricks of suspected drugs, as well as

21   license plates issued for the Bentley.  Arrest Report (doc. no. 51) at LAWSON-0032;

22   Williams Decl. ¶ 4.  Defendant was arrested and transported to the Livermore Police

23   station, where Officer Williams read defendant his *Miranda* rights.  Williams Decl. ¶ 5.

24   **II.   Motions to Suppress Evidence Obtained Pursuant to Warrants**

25   Defendant moves to suppress evidence seized pursuant to the three GPS tracking

26   warrants (Captiva, Equinox and Bentley) and the UPS parcel warrant.  Doc. nos. 39-42.

27   The government filed a consolidated opposition to those four motions to suppress, which

28   does not challenge defendant's standing to bring those motions.  Doc. no. 52.  Defendant

United States District Court
Northern District of California

5

1   filed a timely reply, doc. no. 56, and, after the motion hearing, filed a late declaration, doc.

2   no. 60, which the court will consider to the extent it is relevant to defendant's request for

3   an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

4   **A.    Legal Standard**

5   **1.    Probable Cause Requirement**

6   "'The traditional standard for review of an issuing magistrate's probable cause

7   determination has been that so long as the magistrate had a substantial basis for

8   concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment

9   requires no more.'" *United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990) (quoting

10  *Illinois v. Gates*, 462 U.S. 213, 236 (1982)) (internal citations and marks omitted).  The

11  test to be applied is whether, using common sense and considering the totality of the

12  circumstances, a magistrate judge can reasonably conclude that there is a "fair

13  probability" that contraband or evidence of a crime will be found in a particular place.

14  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "For a finding of probable cause to satisfy this

15  nexus requirement, there must be a fair probability both that a crime has been committed

16  and that evidence of its commission will be found in the location to be searched."  *United*

17  *States v. Tan Duc Nguyen*, 673 F.3d 1259, 1263 (9th Cir. 2012) (citations omitted).  "[A]

18  magistrate judge must look to the totality of the circumstances to determine whether the

19  supporting affidavit establishes probable cause."  *United States v. Alvarez*, 358 F.3d

20  1194, 1203 (9th Cir. 2003).  The issuing judge's probable cause finding is entitled to

21  "great deference."  *United States v. Grant*, 682 F.3d 827, 832 (9th Cir. 2012) (citation and

22  internal marks omitted).

23  Ordinarily, only evidence that is obtained in violation of a warrant is suppressed.

24  *United States v. Tamura,* 694 F.2d 591, 597 (9th Cir. 1982).  "However, in cases where

25  there is a 'flagrant disregard' for the terms of the warrant, the district court may suppress

26  all of the evidence, including evidence that was not tainted by the violation."  *United*

27  *States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992) (quoting *United States v. Medlin,* 842

28  F.2d 1194, 1199 (10th Cir. 1988)).  "This extraordinary remedy should be used only when

United States District Court
Northern District of California

1  the violations of the warrant's requirements are so extreme that the search is essentially

2  transformed into an impermissible general search." *Id.*

3  ### 2.    Evidentiary Hearing

4  There is "a presumption of validity with respect to the affidavit supporting [a]

5  search warrant." *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978).  However, in *Franks*,

6  the Supreme Court held that:

> [W]here the defendant makes a substantial preliminary
> showing that a false statement knowingly and intentionally, or
> with reckless disregard for the truth, was included by the
> affiant in the warrant affidavit, and if the allegedly false
> statement is necessary to the finding of probable cause, the
> Fourth Amendment requires that a hearing be held at the
> defendant's request.

11  438 U.S. at 155-56.  A *Franks* hearing is held to investigate the veracity of the affiant.

12  *United States v. Dozier*, 844 F.2d 701, 704 (9th Cir. 1988).

13  A party moving for a *Franks* hearing bears the burden of proof and must make a

14  substantial showing to support the elements entitling him to a *Franks* hearing.  *United*

15  *States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).  Under Ninth Circuit

16  authority, the court must conduct a *Franks* hearing to allow a defendant to challenge the

17  sufficiency of an affidavit if he makes "a substantial preliminary showing that (1) the

18  affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged

19  of its falsities would not be sufficient to support a finding of probable cause."  *United*

20  *States v. Stanert*, 762 F.2d 775, 780 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985)

21  (citations and internal marks omitted).

22  ### B.    Captiva Warrant

23  ### 1.    Probable Cause

24  Defendant challenges the use of a GPS tracking device on his rental car (Captiva)

25  for lack of probable cause to support issuance of the warrant for its use on October 22,

26  2014.  This was the first of three GPS tracking warrants issued against defendant.  The

27  parties do not dispute that installation of a GPS device on a vehicle constitutes a search

28  within the meaning of the Fourth Amendment.  *United States v. Jones*, 132 S. Ct. 945,

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    949 (2012).  Defendant argues that the Captiva warrant lacked probable cause and

2    tainted all the subsequent searches and seizures.

3            Defendant contends that the Captiva warrant suffers from conclusory statements

4    that are insufficient to establish probable cause.

5                    (a) conclusory statements that the affiant believed that the Captiva was

6                    used to transport and conceal marijuana.

7    Read in context, Officer Robertson stated this belief based on the specific, detailed facts

8    obtained during the course of the investigation, including defendant's prior criminal

9    history, including four prior drug offenses, two of which were related to marijuana (in 2002

10   and 2004), and that he had been on probation since February 2014 from a 2009 drug

11   trafficking conviction.  Officer Robertson also noted in the Captiva affidavit that defendant

12   travelled between San Francisco and Cincinnati about 2 or 3 times a month since

13   January 2014, and that he used wire transfers and money orders to move money to San

14   Francisco.  The affidavit notes that almost all the wire transfer amounts are under the

15   federal mandatory reporting limit to avoid reporting requirements, demonstrating attempts

16   to evade law enforcement and indicative of drug trafficking.

17           Defendant points out that the affiant fails to specify that defendant's arrest by DEA

18   in 2013 at the Cincinnati airport on an "open Drug Trafficking warrant from Hamilton

19   County, Ohio" was actually pursuant to a bench warrant issued for a 2009 drug

20   conviction.  Mot. Suppress Equinox Warrant (doc. no. 40) at 5-6.  Defendant does not

21   articulate any material difference between an open warrant and a bench warrant, which

22   was issued for the 2009 drug conviction.  Further, defendant does not dispute that he had

23   a 2009 drug trafficking conviction, and the Captiva affidavit clearly states that defendant

24   was not sentenced on the 2009 drug trafficking conviction until February 2014, when he

25   was sentenced to 3 years of probation.

26           Defendant also takes issue with the statement in the Captiva affidavit that the DEA

27   conducted a consensual search of his person and carry-on bag at the Cincinnati airport

28   on October 19, 2013, arguing that he never gave consent to the search and that no

1    charges were brought against him based on the cash that was seized that day.  *See*

2    Lawson Decl. (doc. no. 60) ¶ 13.  The legality of that search is not properly raised before

3    this court, particularly in light of defendant's concession that he was not charged based

4    on evidence from that search and that he recovered the $29,147 that was seized from

5    him.  *Id.* ¶ 14.

6                    (b) conclusory statements that the affiant "discovered" that defendant used

7                    wire transfers, without identifying any specific instance where or when these

8                    occurred.

9    Officer Robertson did not purport to have personal knowledge of these wire transfers or

10   money order purchases, but refers to knowing of this activity "through departmental

11   resources."  The government points out that it has produced documents showing that

12   defendant used wire transfers and money orders to move funds from Ohio to California,

13   although it does not appear from the record that this evidence was submitted with the

14   search warrant application.  Consolidated Opp. (doc. no. 52) at 16.  Defendant cites no

15   authority holding that an affiant may not rely on facts obtained through the police

16   department during the course of an investigation, and that such information would not be

17   "reasonably trustworthy" for the issuing judge to rely on to find probable cause.

18          Defendant also seeks an evidentiary hearing to challenge the affiant's assertion

19   that defendant used wire transfers to send money in amounts less than $10,000 to

20   California, evidence of which the government has since produced in discovery.  Mot.

21   Suppress Captiva Warrant (doc. no. 39) at 17.  The evidence submitted by defendant of

22   certain wire transfer activity in 2009-2010 and select money orders that appear to be

23   dated October 2013 and March 2014, does not demonstrate falsity in the Captiva

24   affidavit's assertion that defendant "uses money orders and multiple wiring locations that

25   are in and out of state to move proceeds back to the west coast," and that "[a]lmost all of

26   the amounts Lawson wires are under the federal mandatory reporting limit ($10,000.00),

27   demonstrating that he is attempting to evade detection from law enforcement."  *See*

28   Lawson Decl. ¶¶ 17, 21 and attachments.  Although defendant argues that none of the

1    transactions were made in an amount "close to $10,000," *id.* ¶ 17, the Captiva affidavit

2    does not assert that any of the transactions involved an amount just below $10,000.

3                        (c) conclusory statement that the affiant believed that defendant was in

4                        Cincinnati to conduct more money laundering activities possibly derived

5                        from drug trafficking, without giving evidence of money laundering or drug

6                        trafficking.

7    Defendant correctly points out that no evidence of drugs was cited in support of the

8    Captiva affidavit, but only indicia of drug trafficking based on defendant's travel pattern

9    and suspicious financial activity.  The affiant indicates, however, that defendant's

10   financial activity, involving multiple wire transfers and money orders to San Francisco in

11   non-reportable amounts, was indicative of money laundering and structuring, and that

12   this is "done due to the lucrative nature of drug trafficking."  Given defendant's prior

13   criminal history involving drug trafficking, as well as the frequent, short trips between San

14   Francisco and Ohio, under the totality of the circumstances, there was a fair probability

15   that the financial activity was related to drug trafficking.

16                        (d) conclusory statement that affiant believes that defendant is involved in

17                        interstate distribution of marijuana, without any evidence of or reference to

18                        marijuana.

19   As noted above, defendant is correct that there was no physical drug evidence to support

20   the Captiva warrant, but only indicia of interstate drug trafficking as stated above.  The

21   affiant stated his belief, based on his training and experience, that drug traffickers use

22   rental cars to store, maintain and transport their illegal narcotics and proceeds.

23        Defendant takes issue with the inference that his pattern of flying to Cincinnati for

24   short, frequent intervals was suspicious activity, because it is "apparent" that he was

25   travelling to Ohio for court appearances as a result of his 2009 conviction.  He contends

26   that his travel pattern does not raise even reasonable suspicion, much less probable

27   cause.  He challenges as false the affiant's statement that defendant purchased a one

28   way ticket to Cincinnati on October 18, 2013, for travel the next day, arguing that he

10

actually purchased his ticket in advance and changed his travel plans on the day he was supposed to travel.  Mot. Suppress Captiva Warrant (doc. no. 39) at 4.  Defendant offers no factual or evidentiary support for this argument, even in his late-filed declaration.  The government responds that changing an airline ticket usually results in rebooking the ticket, so that there was no misrepresentation by the affiant.  Consolidated Opp. (doc. no. 52) at 22.  Defendant does not demonstrate that the affiant would have known that defendant previously bought his ticket and changed his itinerary for the 2013 trip, or how this error would have been material to the probable cause determination, particularly because defendant was arrested at CVG airport on October 19, 2013, on a bench warrant for a 2009 conviction.

Defendant speculates that the affiant relied on a confidential source of information about defendant's travel booking activity, which defendant assumes was an insider at the airport ticketing counter.  Reply to Consolidated Opp. (doc. no. 56) at 2-3 and n.1.  Even assuming that law enforcement relied on a tipster for this information, the reliability of the tip was verified by the officer's surveillance at the airport and defendant's actual presence at CVG, particularly concerning the statement, "On October 21, 2014, TFO Baker learned Lawson purchased a one way ticket to Cincinnati, Ohio from San Francisco and would be arriving at the Cincinnati/Northern Kentucky Airport at approximately 8:50 am the following day, October 22, 2014."  Officer Baker then conducted surveillance and observed defendant arriving at CVG and going to the rental car desk to rent the Captiva on October 22, 2014.

Defendant also suggests that the affiant misled the issuing judge by failing to mention the fact that defendant was required by court-ordered probation to travel to Cincinnati, and seeks a *Franks* hearing to challenge this omission.  Mot. Suppress Captiva Warrant (doc. no. 39) at 17.  Defendant argues that the affiant insinuated that defendant was going to Cincinnati for the sole purpose of drug trafficking by failing to indicate that defendant was travelling for legitimate purposes.  Defendant points out that the officer referred to defendant entering "the juvenile court building" rather than

1   specifying that he entered the "800 Broadway Building" or court-annex, where the

2   probation department is located.  Mot. Suppress Equinox Warrant (doc. no. 40) at 6.

3   However, the Captiva affidavit dated October 22, 2014, clearly states that defendant was

4   on probation as of February 2014, and that he went to the juvenile court building at "800

5   Broadway" in downtown Cincinnati during an earlier trip on October 8, 2014, after which

6   surveillance was terminated.  Thus, on the face of the affidavit, the fact that defendant

7   was on probation was not omitted, and the affidavit disclosed that defendant entered a

8   Hamilton County court building during his earlier visit to Cincinnati. On this record, there

9   was no deliberate misrepresentation or omission of the fact that defendant was on

10  probation, and a *Franks* hearing is not warranted.

11          If viewed alone, the travel pattern to attend court appearances and meetings with

12  a probation officer in Cincinnati would not raise a fair probability that a crime was being

13  committed.  But when viewed in the light of the money order purchases and wire transfer

14  activity, it is reasonable to conclude from the travel pattern to and from Cincinnati that

15  there is a "fair probability" that contraband or evidence of a crime would be found by

16  tracking defendant's rental car.  As the government points out, defendant's argument fails

17  to acknowledge "that a person can travel to Cincinnati for a court-order[ed] probation visit

18  in the morning and then spend the afternoon engaging in criminal activity.  The two

19  activities are not mutually exclusive."  Consolidated Opp. (doc. no. 52) at 14.

20          The motion to suppress evidence seized pursuant to the Captiva warrant is

21  DENIED.  In the absence of a preliminary showing of a deliberate falsehood or reckless

22  disregard for the truth, defendant's request for a *Franks* hearing to challenge the

23  statements in the Captiva affidavit is also DENIED.

24                  **2.      Taint**

25          Defendant argues that use of the GPS tracking of the Captiva is critically

26  intertwined with the subsequent surveillance of his activities in Ohio, including where he

27  traveled and with whom he met, which was used in support of the Equinox warrant, which

28  in turn led to discovery of the UPS package containing $336,920 in U.S. Currency, which

United States District Court
Northern District of California

was subsequently cited in support of the Bentley GPS tracking warrant.  Defendant also refers to search warrants obtained by law enforcement after defendant was arrested, to search defendant's home at 2123 Brandywine Place, Hayward, and for bank accounts at Wells Fargo; neither the Brandywine Warrant nor Wells Fargo Warrant are the subject of the motions to suppress, except to the extent that defendant seeks to suppress all evidence tainted by the illegality of earlier searches.  Because the Captiva warrant is supported by probable cause, however, it is not necessary to reach the issue whether subsequent search warrants and seizures were tainted by the Captiva warrant.

### C.    Equinox Warrant

Defendant seeks suppression of all evidence obtained directly or indirectly from the search warrant issued by the Hamilton County court on December 3, 2014, which authorized installation of a GPS tracker on defendant's rental car, a red 2015 Chevrolet Equinox.  Defendant contends that the warrant was not supported by probable cause and contained falsities and misrepresentations.  Defendant seeks an evidentiary hearing to challenge the statements in the warrant affidavit pursuant to *Franks*.

#### 1.    Probable Cause

Defendant re-asserts his challenges to the defects in the Captiva warrant affidavit in support of his motion to suppress the Equinox warrant, which was based on the facts asserted in the Captiva warrant (discussed in section II.B, above), plus information obtained as a result of the Captiva warrant: that on October 22, 2014, defendant went to the juvenile court building for a scheduled probation visit, as confirmed by the probation officer after the visit; that Task Force Officer Baker installed a GPS device on the Captiva while defendant was meeting with his probation officer; that investigators tracked defendant throughout the day and learned of three local associates (Garnett, Blair and Jones) who had local drug histories, two of whom (Garnett and Blair) were known to law enforcement as local large scale narcotics distributors from prior investigations.  The Equinox affidavit also asserted additional information provided to Task Force Officer Baker by the DEA in Oakland during November 2014, indicating that defendant was

United States District Court
Northern District of California

United States District Court
Northern District of California

1   sending cocaine and heroin to Cincinnati using parcel services, and travelling to

2   Cincinnati to collect money.  At the same time, a confidential source contacted TFO

3   Baker and confirmed that Garnett is a large scale cocaine and heroin distributor in the

4   Cincinnati area.  Equinox Affidavit (doc. no. 52) at LAWSON 287.

5                              a.       **Three Associates**

6          Defendant challenges the factual assertions that the three "associates" were

7   known drug dealers as conclusory, and notes that the government has not provided any

8   discovery about their suspected drug trafficking because the investigations are ongoing.

9   Mot. Suppress Equinox Warrant (doc. no. 40) at 7.  Defendant notes that the affidavit fails

10  to state that during the investigation, defendant was observed meeting the three

11  associates at a restaurant for lunch, and that Garnett and Blair were later identified during

12  a traffic stop after leaving the restaurant but no illegal activity was discovered.  Also,

13  defendant and Garnett were observed at an apartment building, and defendant and

14  Jones were observed later at another residence and seen hugging, but no illegal activity

15  was observed at any point.  *Id.* at 7-8.  Thus, defendant contends that the affiant

16  deliberately misled the issuing judge by falsely characterizing the three companions as

17  "associates," falsely stating that they had local drug histories, and by omitting the fact that

18  they were not observed in any criminal activity.  *Id.* at 20.

19         Although the government has not come forward with evidence to prove that the

20  three companions had criminal histories involving drug offenses, it was not necessary for

21  the affiant, who was a law enforcement officer, to present the issuing judge with criminal

22  records to substantiate the assertion that all three men had local drug histories and that

23  Garnett and Blair were known to local law enforcement as large scale distributors based

24  on prior investigations.  The affiant further indicates that a confidential source contacted

25  TFO Baker and confirmed that Garnett was a "large scale cocaine and heroin distributor

26  operating within the greater Cincinnati, Ohio area."  Furthermore, the Equinox affidavit

27  does not characterize defendant's meeting with Garnet, Blair and/or Jones as engaging

28  in illegal activity.  In the context of the ongoing investigation, the affiant's use of the term

1  "associates" in the Equinox affidavit is not misleading and does not warrant an

2  evidentiary hearing pursuant to *Franks*.

3  **b.    Confidential Sources**

4  Defendant also challenges the affiant's statement that DEA agents informed TFO

5  Baker that defendant was sending cocaine and heroin packages to Cincinnati by UPS

6  and then travelling to Cincinnati to collect the sales proceeds, because there were no

7  facts to support this contention.  Defendant contends that the government has not

8  produced information to corroborate the affidavit, noting that the only report produced by

9  the government refers to information provided by a confidential source which does not

10  specifically refer to defendant shipping packages of heroin and cocaine to Cincinnati.

11  Mot. Suppress Equinox Warrant (doc. no. 40) at 21.  The report cited by defendant states

12  that the source of information (SOI) indicated that "Lawson is distributing large amounts

13  of marijuana, cocaine and heroin in the San Francisco Bay Area and also shipping the

14  drugs to multiple different states, including Michigan, Ohio and Tennessee." *Id.* at 9.  The

15  SOI's reference to Ohio in this report, without specific reference to Cincinnati, does not

16  make a substantial showing of falsity, given that the affiant also relied on other

17  information provided by the DEA in Oakland, including investigation into defendant's

18  travel patterns and financial activity.  On this record, defendant fails to show that the

19  affiant falsely stated that the DEA provided information to TFO Baker or that the

20  statement was intentionally false or made with reckless disregard for the truth.

21  **c.    Defendant's Probation-Related Travel**

22  Lastly, defendant challenges the affiant's statement that he learned of defendant's

23  court date on December 3, 2014, through defendant's probation officer, and knew of

24  defendant's probation status and the legitimate purpose of his visits to Cincinnati, but

25  used defendant's travel pattern to seek a GPS tracking warrant.  As discussed above

26  with respect to the Captiva warrant affidavit, the Equinox affidavit acknowledged that

27  defendant was on Hamilton County probation and did not hide or omit the fact that he

28  was on probation or that he went to the county court building.  The Equinox affidavit

United States District Court
Northern District of California

1   further verified that defendant met with his probation officer on October 22, 2014, after

2   confirming with defendant's probation officer.

3                          **d.      Totality of Circumstances**

4              Under the totality of the circumstances, the Equinox affidavit supports a fair

5   probability that defendant was involved in illegal distribution of controlled substances and

6   that evidence of the criminal activity would be found by monitoring defendant's rental car,

7   based primarily on the background facts asserted in the Captiva affidavit: defendant's

8   criminal history, including 4 prior drug offenses and current probationary status for a 2009

9   drug trafficking conviction; defendant's travel pattern of short trips to Cincinnati about 2 or

10  3 times per month; defendant's practice of using wire transfers and money orders in Ohio

11  to move money back to the Bay Area; the affiant's 15 years' law enforcement experience

12  and familiarity with drug trafficking, and his opinion that defendant's financial patterns

13  were indicative of evading detection by law enforcement and money laundering.

14             The Equinox affidavit was also supported by additional facts obtained from

15  surveillance from his earlier trip to Cincinnati when his Captiva rental car was tracked:

16  after defendant met with his probation officer on October 22, 2014, he met with three men

17  who have local drug histories, two of whom were known to be large-scale narcotics

18  dealers.  Although the affiant did not provide specific criminal histories for those three

19  associates, it was reasonable for the issuing judge to rely on the affiant's familiarity with

20  their criminal histories, given that the affiant was a local law enforcement officer.  The

21  DEA also had recently provided information that defendant was sending cocaine and

22  heroin to Cincinnati and traveling there to collect proceeds from the drug sales,

23  supporting probable cause to issue a GPS tracker warrant.

24             The motion to suppress evidence seized pursuant to the Equinox warrant, and

25  request for *Franks* hearing, are DENIED.

26          **D.      UPS Package Warrant**

27             Defendant contends that law enforcement lacked reasonable suspicion to detain

28  the UPS package, addressed to LeShawn Lawson, The Speed Repairs, [ ] Hayward, CA

United States District Court
Northern District of California

1    94544, to conduct a dog sniff, and that the search warrant authorizing the search of the

2    UPS package lacked sufficient probable cause.  Doc. no. 41.  Defendant also requests

3    an evidentiary hearing to test Officer Robertson's deliberately false statements in the

4    UPS affidavit.  Defendant further argues that the evidence seized pursuant to the UPS

5    warrant should be suppressed as the tainted fruit of the two earlier GPS tracking warrants

6    (Captiva and Equinox), but as the court has found that those earlier warrants were

7    supported by probable cause, it is not necessary to reach the issue of taint.

8                    **1.     Reasonable Suspicion to Detain Parcel**

9            Law enforcement authorities may detain a package to conduct an investigation "if

10   they have a reasonable and articulable suspicion" that it contains contraband or evidence

11   of illegal activity.  *United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir. 2002)

12   (citation omitted).  *See United States v. Hoang*, 486 F.3d 1156, 1162 (9th Cir. 2007)

13   (Fourth Amendment rights were not implicated by a brief ten-minute detention of package

14   in FedEx hold room without reasonable suspicion before random dog sniff because it did

15   not interfere with FedEx's ability to deliver his package on time).  To determine whether

16   reasonable suspicion exists, reviewing courts "must look at the 'totality of the

17   circumstances' of each case to see whether the detaining officer has a 'particularized and

18   objective basis' for suspecting legal wrongdoing."  *Id.* (quoting *United States v. Arvizu*,

19   534 U.S. 266, 273 (2002)).

20           The government does not dispute that reasonable suspicion was necessary to

21   detain the parcel for examination by a trained canine, and does not contend that the

22   detention of the package was so brief that it did not implicate Fourth Amendment

23   interests, as in *Hoang*.  Defendant contends that law enforcement lacked reasonable

24   suspicion to detain the package from UPS because the package was detained solely on

25   the basis of its mere association with defendant, without evidence of illegality.  Mot.

26   Suppress UPS Warrant (doc. no. 41) at 11.

27           As set forth by the government, the UPS parcel warrant affidavit includes detailed

28   facts that establish reasonable suspicion to detain the package to conduct a dog sniff:

1        (i) Officer Robertson received information that defendant is a "large scale cocaine

2    and heroin dealer [who] ships cocaine and heroin from Hayward, California to Cincinnati,

3    Ohio using parcel services."  Although the affidavit did not set forth the source of this

4    information within the four corners of the UPS warrant, Officer Robertson was an

5    investigator with the Major Drug Offender Unit and the ongoing investigation by law

6    enforcement supported reasonable suspicion to detain the package, particularly in light of

7    the information from the DEA in Oakland that Officer Robertson articulated in the Equinox

8    affidavit, including information that defendant was sending cocaine and heroin to

9    Cincinnati and travelling to Cincinnati to collect proceeds from the drug sales.

10       (ii) on December 3, 2014, defendant was seen leaving a UPS store and FedEx

11   store with packaging materials, driving to a residence and meeting with known local drug

12   dealers, driving to a UPS store and shipping a large parcel.  This activity, combined with

13   the information from DEA discussed above, supports reasonable suspicion to detain the

14   UPS package for further investigation.

15                 **2.**     **Dog Sniff Supported Probable Cause**

16       Defendant argues that the alert by a trained canine to the presence of a controlled

17   substance does not support probable cause to issue a warrant because up to 96% of all

18   U.S. currency is tainted with a controlled substance.[1]  Mot. Suppress UPS Warrant (doc.

19   no. 41) at 12-13.  Defendant fails to articulate how the dog sniff was unreliable under the

20   holding of *Florida v. Harris*, 133 S. Ct. 1050 (2013), which is controlling on whether a

21   trained drug detection canine can provide probable cause for a search.

22       In *Harris*, the court noted that the well-established "totality of the circumstances"

23   standard for probable cause applied to drug detection canines, and rejected a strict

24   evidentiary checklist developed by the Florida Supreme Court.  "The question—similar to

25   every inquiry into probable cause—is whether all the facts surrounding a dog's alert,

26

27   _____

[1]   In making this argument, defendant fails to consider that the dog alert would suggest

28   the presence of drugs, not cash, and that it was unexpected to discover that someone
would ship over $300,000 cash in a UPS package.

United States District Court
Northern District of California

1    viewed through the lens of common sense, would make a reasonably prudent person

2    think that a search would reveal contraband or evidence of a crime."  *Harris*, 133 S. Ct. at

3    1058.  The Court held that "evidence of a dog's satisfactory performance in a certification

4    or training program can itself provide sufficient reason to trust his alert," and that a court

5    can presume (subject to any conflicting evidence offered) that the dog's alert provides

6    probable cause to search "[i]f a bona fide organization has certified a dog after testing his

7    reliability in a controlled setting," or, "even in the absence of formal certification, if the dog

8    has recently and successfully completed a training program that evaluated his proficiency

9    in locating drugs."  *Harris*, 133 S. Ct. at 1057.

10        The government notes that the UPS affidavit provides background information on

11   Bronco, the trained canine that alerted defendant's UPS package, to establish his

12   reliability: Bronco's handler, Officer Bonner, is certified through the State of Ohio as a

13   canine handler, and Bronco is trained and certified through the State of Ohio.

14   Additionally, Bronco has alerted to the odor of drugs at other locations which have been

15   proven to be true and correct on numerous occasions in the past.  UPS Affidavit (doc. no.

16   52) at LAWSON-0278.  Defendant does not dispute the accuracy of Bronco's credentials,

17   and does not show that a probable cause hearing to challenge the evidence of Bronco's

18   reliability is warranted.

19        Bronco's alert to the UPS package, in light of the other reliable evidence of

20   defendant's drug trafficking activities presented in the UPS affidavit, established a fair

21   probability that evidence of criminal activity would be found in the UPS package

22   addressed to defendant at a business address in Hayward.  Looking at the statements in

23   the UPS affidavit, the specific observations of defendant shipping a large parcel at the

24   UPS store after meeting with local cocaine and heroin distributors are reasonably

25   trustworthy facts.  Under the totality of the circumstances, including observations of

26   defendant by law enforcement and the positive alert by a trained canine, the affidavit

27   demonstrated probable cause to search the UPS package.

28

United States District Court
Northern District of California

### 3.     Request for *Franks* Hearing

Defendant contends that the UPS affidavit contains misstatements asserting that defendant was a drug dealer without supporting evidence and omissions about the nature of his visits to Cincinnati as required for his court probation.  Mot. Suppress UPS Warrant (doc. no. 41) at 16-17.  The court determines that a *Franks* hearing is not warranted because defendant has not made a preliminary showing that any statement was false or that the misstatement was material.  Although the UPS affidavit lacks the detailed information supporting Officer Robertson's statement that defendant was a drug dealer who shipped cocaine and heroin to Cincinnati, the information provided by DEA to Cincinnati police is set forth in more detail in Robertson's Equinox affidavit.  In light of the record, defendant fails to make a preliminary showing of falsity or reckless disregard for the truth.  Furthermore, the fact that defendant had a court appearance scheduled on December 3, 2014, was not material to the showing of probable cause based on observations of defendant's actions outside the courthouse, including making trips to UPS and FedEx stores, meeting with individuals known to local law enforcement as drug dealers, and then shipping a large parcel from a UPS store which triggered an alert by a trained drug detection canine.

The motion to suppress evidence seized pursuant to the UPS warrant, and request for an evidentiary hearing pursuant to *Franks* to challenge the veracity of statements in the UPS affidavit, are therefore DENIED.

### E.     Bentley Warrant

Defendant contends that the Bentley warrant lacked probable cause because the affidavit was premised on uncorroborated information from an unnamed, unreliable source, and on conclusory statements that defendant was engaged in criminal activity based on observations of defendant conducting apparently lawful activities.  Mot. Suppress Bentley Warrant (doc. no. 42).

Defendant also challenges the Bentley warrant on the ground that the prior warrants permitting GPS tracking of the Captiva and Equinox and search of the UPS

parcel were illegal and tainted all the evidence subsequently seized as fruits of the poisonous tree. *Id.* at 23-25. This challenge to the Bentley warrant is rendered moot by the court's finding that those earlier warrants were supported by probable cause.

### 1. Reliability of Confidential Source

Defendant contends that the confidential informant's tip is not sufficiently reliable to support probable cause to issue the Bentley warrant. To determine whether information provided by informants establishes probable cause, the issuing magistrate looks to the "totality of the circumstances." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1396 (9th Cir. 1986) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Evidence bearing on the veracity of the informant and his basis of knowledge is considered together with other relevant evidence in making the probable cause determination based on the totality of the circumstances. *Angulo-Lopez*, 791 F.2d at 1396. Defendant challenges the informant's reliability because the affiant discloses that the CS receives monetary compensation and that the CS has a prior conviction for making/passing a fictitious check, rendering him a fraud and unreliable. Sealed Winston Affidavit ¶ 16 n.2.

Defendant cites *United States v. Rowland*, 464 F.3d 899 (9th Cir. 2006), where the court identified several factors to be considered in determining the reliability of an informant's tip.

> First, a known informant's tip is thought to be more reliable than an anonymous informant's tip. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000); *Adams v. Williams*, 407 U.S. 143, 146–47 (1972). That is because an anonymous informant typically cannot be questioned about the basis for knowing the information or motive for providing the tip, nor can the anonymous informant be held accountable for providing false information in violation of the law. *See J.L.*, 529 U.S. at 271; *Adams*, 407 U.S. at 146–47. Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant. *See Adams*, 407 U.S. at 146–47. Third, the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information. *See Spinelli v. United States*, 393 U.S. 410, 416 (1969), *abrogated on other grounds by Gates*, 462 U.S. at 238. Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source.

1

> *See* [*Alabama v. White*, 496 U.S. 325, 329–30 (1990)]; *Gates*, 462 U.S. at 243–45; *Draper v. United States,* 358 U.S. 307, 313 (1959).   Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, *see White*, 496 U.S. at 332, *J.L.*, 529 U.S. at 272, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities, *see Gates*, 462 U.S. at 245 n. 13.

2

3

4

5

6    *Rowland,* 464 F.3d at 907-08.

7         Here, the informant made himself known to the DEA agents, who met with the

8    informant personally on December 9, 2014.  Consolidated Opp. (doc. no. 52) at 4 n.2.

9    The government represents that a copy of the DEA report detailing this meeting with the

10   CS was produced to the defense.  Further, the CS revealed the basis of knowledge of the

11   tip and provided detailed statements made to the CS by defendant on November 30,

12   2014: (1) defendant was going to L.A. to pick up cocaine; (2) the cocaine supplier was a

13   Crip; (3) defendant would ship the bricks to Ohio on December 1; (4) the shipment of

14   cocaine would arrive in Ohio on December 2; (5) defendant was due to appear in court in

15   Ohio on December 3; and (6) defendant drives the Bentley to L.A. to pick up cocaine.

16   Sealed Winston Affidavit ¶¶ 16-17.  Defendant now disputes that he ever told anyone that

17   he went to L.A. to pick up bricks to send to Ohio or that he was affiliated with the Crips,

18   doc. no. 60 ¶¶ 20-21, but cites no authority requiring law enforcement to verify with

19   corroborating evidence that a suspect under investigation made statements to a

20   confidential informant for the purpose of establishing probable cause.  Rather, "[w]hen a

21   search warrant is based solely on an informant's tip, the proper analysis is whether

22   probable cause exists from the totality of the circumstances to determine a sufficient level

23   of reliability and basis of knowledge for the tip.  *United States v. Bishop*, 264 F.3d 919,

24   924 (9th Cir. 2001) (citing *Gates*, 462 U.S. at 238).

25        Although defendant also argues that the information provided by the CS was

26   uncorroborated, the information about defendant's plans to travel to Ohio on December 3

27   for a court date in Ohio on December 3 was independently verified by law enforcement in

28   Cincinnati.  Cincinnati Police Officer Robertson verified with defendant's probation officer

United States District Court
Northern District of California

1   that defendant had a probation visit that day, after the visit concluded.  *See* Equinox

2   Affidavit (doc. no. 52, Ex. D).  *See Angulo-Lopez*, 791 F.2d at 1397 ("A citizen informant's

3   veracity may be established by the absence of an apparent motive to falsify and

4   independent police corroboration of the details provided by the informant.") (citations

5   omitted).  Defendant points out that law enforcement did not corroborate that defendant

6   ever shipped drugs anywhere at any time, much less on the date that the CS indicated.

7   However, defendant cites no authority requiring law enforcement to corroborate all

8   details, though corroboration of the information is relevant in weighing the CS's reliability.

9          Defendant also points out that the agents obtained information about defendant's

10  December 3 travel plans from the CS after the fact, since the CS was not interviewed

11  until December 9.  Thus, defendant argues that the CS did not provide predictive

12  information at all, and that the Bentley affidavit mischaracterizes the CS as a reliable

13  source.  However, the affidavit indicates that the CS met defendant on November 30, and

14  the information from the CS about defendant's travel plans to Cincinnati was consistent

15  with Cincinnati law enforcement's investigation.  Further, the Bentley affidavit was dated

16  December 29, 2014, after defendant traveled to Cincinnati, and did not suggest that

17  "these events have yet to unfold," as defendant argues.  Reply to Consolidated Opp.

18  (doc. no. 56) at 6.

19         Although defendant argues that the CS's background shows that he/she had a

20  motive and tendency to lie, the detailed basis of knowledge weighs in favor of reliability

21  under the *Rowland* factors, and outweighs the CS's criminal history and motivation for

22  providing information to the DEA, which was disclosed to Magistrate Judge Zimmerman

23  in the Bentley affidavit.  Sealed Winston Affidavit ¶ 16 n.2.

24              **2.     Observations by Law Enforcement**

25         Defendant also challenges the mischaracterization of defendant's lawful activities,

26  observed by DEA agents and Cincinnati police officers, as indicative of criminal activity.

27  Defendant points out that travelling to Cincinnati for court-required visits, renting a car,

28  going to shipping stores, visiting friends, and shipping a large parcel are innocuous

United States District Court
Northern District of California

United States District Court
Northern District of California

1   activities on their face.  He contends that the inference of criminality is based only on the

2   officers' conclusory statements which were offered in the probable cause affidavits.

3   Although each of these activities standing alone would not give rise to believe that there

4   was a fair probability of criminal activity, taken together, they gave rise to probable cause.

5   As discussed above, the earlier observations in Ohio by law enforcement were detailed in

6   the Bentley affidavit: on December 3, 2014, defendant was seen leaving a UPS store and

7   a FedEx store with packaging materials, then drove to a residence where law

8   enforcement recognized several individuals from current investigations involving high-

9   level cocaine traffickers.  Sealed Winston Affidavit ¶¶ 19-20.  Defendant was seen

10  loading a large parcel into the trunk of his rental car and taking it to a UPS store, then

11  leaving with papers in his hand.  The parcel was identified positive for narcotics by a K-9

12  and searched pursuant to a warrant, leading to discovery of $337,040.

13          Defendant reasserts his challenges to the dog alert, and contends that even if

14  there was probable cause to believe that the money seized from the UPS package was

15  involved in illegal activity, there is no nexus between the UPS parcel and the Bentley.

16  Mot. Suppress Bentley Warrant (doc. no. 42) at 21.  Although no drugs were found at that

17  point, the amount of cash found in a parcel that the canine alerted positive for drugs,

18  when considered in light of all the evidence, supported a fair probability that defendant

19  was involved in drug trafficking activity.  Based on the totality of the circumstances, the

20  DEA agent concluded that "the $337,040 seized from the parcel were proceeds from the

21  illegal sale of narcotics."  Sealed Winston Affidavit ¶ 22.

22          The government also relies on the evidence that defendant purchased a Bentley

23  for $72,075 in cash even though he was not legitimately employed.  This unexplained

24  wealth supports a reasonable inference that the significant amount of cash was gained

25  through drug trafficking.  Consolidated Opp. (doc. no 52) at 5.  *See United States v.*

26  *Miguel*, 952 F.2d 285, 289 (9th Cir. 1991) ("We have held that evidence of sudden or

27  unexplained wealth is admissible in drug conspiracy trials if it creates a reasonable

28  inference that the unexplained wealth came from the drug conspiracy.") (citing *United*

*States v. Patterson*, 819 F.2d 1495, 1501 (9th Cir. 1987) ("Evidence of unexplained wealth is relevant in a narcotics conspiracy case if it creates a reasonable inference that the unexplained wealth came from the narcotics conspiracy.")).  Based on defendant's statements to the CS that he drives the Bentley to L.A. to pick up cocaine and other evidence of drug trafficking presented in the affidavit, the affidavit presented a fair probability that monitoring the Bentley would likely provide evidence of defendant's drug trafficking activity by providing information about his movement after he obtains large quantities of cocaine.

### 3.   Good Faith Reliance

The government argues that even if the Bentley warrant was defective, the officers relied on the magistrate judge's probable cause determination in good faith and the exclusionary rule would not serve a deterrent purpose under *United States v. Leon*, 468 U.S. 897, 922 (1984).  The court need not reach the good faith exception, having determined that the Bentley affidavit supported probable cause to issue the warrant authorizing the GPS tracking device.

### 4.   Request for *Franks* Hearing

Defendant contends that the Bentley affidavit contains the following misstatements and omissions and seeks an evidentiary hearing under *Franks*.  Mot. Suppress Bentley Warrant (doc. no. 42) at 21-22.

(a)      ¶ 16: That defendant told the CS that his supplier of cocaine is a member of the "Crips" in Los Angeles, California.

Defendant contends that he never made this statement, and states that he has never been affiliated with the Crips.  Lawson Decl. (doc. no. 60) ¶ 21.  Defendant also argues generally that two DEA reports citing an unnamed source contain information that materially differs from the information in the Bentley affidavit, particularly the statement identifying his source of cocaine in L.A. as a member of the Crips and the specific statements about shipping bricks to Ohio on a particular date.  Doc. no. 42 at 5-6.

25

United States District Court
Northern District of California

1    The government points out that defendant's statements to the CS were

2    memorialized in a DEA report detailing the meeting between the CS and law enforcement

3    on December 9, 2014.  To the extent that defendant argues that the CS information in the

4    affidavit differed from the content of DEA reports, the government refers to the December

5    9, 2014 report detailing the interview with the CS.  Defendant does not rebut the

6    government's reference to the report produced in discovery.

7             (b)     ¶ 16: That defendant told the CS that he would ship the "bricks" out

8                     on Monday (December 1, 2014) to Ohio and that the load of cocaine would

9                     arrive in Ohio on Tuesday (December 2, 2014).

10    Defendant disputes ever making this statement or ever shipping narcotics.  Lawson Decl.

11    (doc. no. 60) ¶ 20.  Defendant also contends that discovery indicates that this information

12    was not provided by the CS, but was only suspected by DEA agents in Cincinnati and

13    was a purely fictional account made up by law enforcement.  Defendant cites a DEA

14    report by Agent Ashley (which was not submitted as an exhibit) noting "Based on prior

15    surveillances conducted on LAWSON by DEA Cincinnati agents/officers, it was

16    suspected that LAWSON had shipped kilogram quantities of cocaine to Ohio and would

17    be facilitating drug transactions when he (LAWSON) arrived on December 3, 2014."  Doc.

18    no. 42 at 6-7.  As noted above, defendant has not rebutted the government's discovery

19    reference to a DEA report detailing its meeting with CS on December 9, 2014, that

20    memorialized the in-person interview with the CS.

21             (c)     ¶ 17 n.3: That defendant is not legitimately employed, yet purchased

22                     the Bentley for $72,075 in cash.

23    Defendant contends that agents were aware that he worked as an iron worker in the Bay

24    Area and as a club promoter for his business, Froggle, Inc.  The government responds

25    that while defendant has claimed that he worked as an iron worker and club promoter, he

26    has not produced documentation to show these were real jobs and does not cite any

27    discovery to show that agents were aware that he was legitimately employed.  Defendant

28

1    has offered no corroborating evidence to support his statement that he was gainfully

2    employed at the time of his arrest as an entertainer and an ironworker.

3                    (d)       ¶ 18: that defendant's court appearance on December 3, 2014 in

4                    Hamilton County Court "was a result of LAWSON previously getting

5                    arrested at CGV for carrying $29,147 in cash on his person."

6    Defendant points out that he was arrested at CGV airport on October 19, 2013 on a

7    bench warrant for a 2009 conviction, and that no charges were filed as a result of the

8    $29,147 in cash that was seized.  The government concedes that the affidavit

9    erroneously attributed defendant's arrest at CGV to the cash seizure rather than the open

10   bench warrant, but argues that this error was an inadvertent mistake, not reckless

11   disregard for the truth.  Viewed in the context of defendant's criminal history, where he

12   was subject to a bench warrant on a 2009 drug trafficking conviction in Hamilton County,

13   Ohio, and was subsequently sentenced after his 2013 arrest, this error in the Bentley

14   affidavit does not appear to be intentionally false or made with reckless disregard to

15   mislead the issuing magistrate judge, given that the affiant confirmed with Cincinnati

16   police that defendant had a court appearance scheduled on December 3.  *See United*

17   *States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995) (FBI's failure to conduct more

18   thorough background check on informant before filing wiretap application did not amount

19   to reckless disregard of the truth) (citing *United States v. Miller*, 753 F.2d 1475, 1478 (9th

20   Cir.1985) ("It might have been prudent for the federal agents to check on [an informant's]

21   background and criminal record, but their failure to do so is not reckless disregard.")).

22            While the affiant concluded erroneously that defendant was arrested for

23   possession of $29,147 that was found on his person, this error was not material, given

24   that the actual basis for the 2013 arrest, a bench warrant for drug trafficking, would have

25   further supported the showing of probable cause in the Bentley affidavit.  *See Meling*, 47

26   F.3d at 1554 (to determine whether misstatements are material so as to warrant a *Franks*

27   hearing, the court considers "whether the affidavits supporting the finding of probable

28   cause, 'once corrected and supplemented, would provide a [reviewing judge] with a

United States District Court
Northern District of California

1    substantial basis for concluding that probable cause existed.'") (quoting *Stanert*, 762 F.2d

2    at 782).

3          Defendant also points out that the Bentley affidavit, ¶ 18, states that an officer

4    maintained "mobile surveillance on LAWSON as he travelled toward downtown

5    Cincinnati, Ohio" from the Budget rental car company, but fails to mention that local law

6    enforcement obtained a GPS tracking warrant and installed a tracking device on

7    defendant's rental car while he was in court on December 3, 2014.  Doc. no. 42 at 8-9.

8    Defendant does not articulate how the fact that the police used a tracking device would

9    be material to the probable cause finding, given that the Bentley affidavit gave specific

10   details about what the Cincinnati police observed while defendant was under

11   surveillance.

12                      (e)     ¶ 20: that when defendant was observed entering the residence at

13                      477 Canvas Back Circle in Cincinnati, "Agents recognized several

14                      individuals at the residence from current investigations involving high-level

15                      cocaine traffickers."

16   Defendant contends that the only individual recognized by law enforcement was

17   Jonathan Blair, and that the government had no evidence that he was involved in cocaine

18   trafficking.  The government responds that it produced a DEA surveillance report from

19   December 3 stating that Jonathan Blair and Antonio Garnett were seen at 477 Canvas

20   Back Circle during the time that defendant was at the residence.  The Equinox warrant

21   affidavit states that Blair and Garnett have local drug histories and are known to law

22   enforcement as local drug distributors from prior investigations.  As discussed earlier,

23   defendant acknowledges that the government has not produced investigative reports

24   related to Blair and Garnett because the investigations are ongoing.  Mot. Suppress

25   Equinox (doc. no. 40) at 7.

26          Even considering the factual assertions in defendant's late-filed declaration, the

27   court determines that defendant has not made a substantial preliminary showing of a

28   false statement in the affidavit, either deliberately or recklessly made, or of the materiality

United States District Court
Northern District of California

of a false statement to warrant a *Franks* hearing.  *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988) (citing *Franks*, 438 U.S. at 171–72).   Accordingly, the motion to suppress evidence seized pursuant to the Bentley warrant and for a *Franks* hearing is DENIED.

**III.    Motion for Revelation and Production of All Informants**

Defendant moves for an order directing the government to disclose the identity of the confidential sources or informants that provided information to law enforcement in the investigation leading to the charges against him, to produce the informants for interview or testimony, and to reveal their locations.  Doc. no. 45.

**A.    Legal Standard**

**1.    *Roviaro* Qualified Privilege**

The government has a qualified privilege to withhold an informant's identity.  *See Roviaro v. United States*, 353 U.S. 53, 59-61 (1957).  There is no fixed rule as to disclosure of the identity of the informant; rather, the public's interest in the flow of information should be carefully balanced against the individual's right to prepare his defense.  *Id.* at 62.  To obtain disclosure of an informant, the defendant must show a need for the information.  *United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2001); *see also United States v. Spires,* 3 F.3d 1234, 1238 (9th Cir. 1993); *United States v. Sai Keung Wong*, 886 F.2d 252, 256 (9th Cir. 1989).  Where the government opposes disclosure of the identity of an informer, this court must balance: "1) the extent to which disclosure would be relevant and helpful to the defendant's case, and 2) the government's interest in protecting the identity of the informant."  *Spires*, 3 F.3d at 1238.  "In doing so the court must consider 'the public interest in protecting the flow of information against the individual's right to prepare his defense.'"  *Id.* (citing *Roviaro*, 353 U.S. at 62.).

In order to balance the interests of the individual and society, the court examines three factors to determine whether an informant's identity should be revealed: (1) the degree of the informant's involvement in the criminal activity; (2) the relationship between

the defendant's asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure.  *United States v. Gonzalo Beltran*, 915 F.2d 487, 488-89 (9th Cir. 1990) (per curiam).  Courts generally require "disclosure where the informant was a participant in, or a witness to the crime charged."  3 Wharton's Criminal Evidence § 11:60 (15th ed. 2001).  Conversely, they "generally do not require disclosure where the informant merely introduced the police officers to the defendant, supplied information to law enforcement officers, played some other peripheral role in the crime, or where the prosecution did not rely on the informant or on information supplied by him in showing the defendants' guilt."  *Id.*

To help in its determination regarding "whether *in fact* any of the informants would be helpful to the defendant, and to aid in its application of the *Roviaro* balancing test," *United States v. Amador-Galvan*, 9 F.3d 1414, 1417 (9th Cir. 1993), the trial court should hold an *in camera* hearing when the defendant is able to make a "minimal threshold showing that disclosure would be relevant and material to at least one defense."  *See Henderson*, 241 F.3d at 645 (citations omitted).  Therefore, a determination regarding disclosure is generally a two-step process.  First, the defendant must demonstrate the "minimal threshold showing" required for an *in camera* hearing.  Second, with the assistance of the *in camera* hearing, the court then makes a determination regarding whether disclosure is appropriate under the standards set forth in *Roviaro*.

### 2.     *Brady* Obligations

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required to disclose information that is favorable to the defendant and material to guilt or punishment.  *Id.* at 87.  The obligation covers not only exculpatory evidence but also information that could be used to impeach government witnesses.  *Giglio v. U.S.*, 405 U.S. 150, 154 (1972).  "Evidence impeaching the testimony of a government witness falls within the *Brady* rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence."  *Singh v. Prunty*, 142 F.3d 1157, 1161 (9th Cir. 1998) (citations omitted).

**B.    Discussion**

    **1.    Defendant's Need for Identity of Informants to Challenge Probable Cause**

Defendant contends that he is entitled to investigate the veracity and potential exculpatory testimony of the following unnamed individuals who provided information because their disclosure is essential to challenging probable cause underlying the various warrants issued in the course of the investigation.

    (a)    The Oakland CI who provided information that defendant was engaged in shipping narcotics through the mail, shipping money via wire and mail, and obtaining narcotics from the Crips street gang.  This individual gave information in exchange for substantial favors, monetary payment, consideration and leniency, and the information was used by law enforcement in support of several warrants issued in this case: (a) that defendant shipped narcotics to Ohio; (b) that defendant would go to L.A. to obtain drugs; (c) that defendant would drive these drugs back from L.A. to the Bay Area before shipping them to Ohio.  *See* Sealed Winston Affidavit.

    (b)    The informant(s) at the Cincinnati airport who tracked defendant's travel patterns.  The government represents that one source of information ("SOI-1") provided information to law enforcement about defendant's flight information and another, SOI-2, provided information about defendant's rental car usage.   Doc. no. 50 at 4.

    (c)    The source of information in Ohio ("SOI-3") who contacted Task Force Officer Baker and confirmed that Antonio Garnett, who was seen with defendant in Cincinnati, currently is a large scale cocaine and heroin distributor in the greater Cincinnati area.  *See* Equinox Warrant Affidavit (Consolidated Opp., Ex. D (doc. no. 52)).

United States District Court
Northern District of California

1    Defendant argues that the *Roviaro* balancing test applies to requests for the

2    identity of, and information supplied by, an informant for the purpose of challenging a

3    search warrant affidavit, and that disclosure of the informants here is necessary to

4    meaningfully challenge probable cause.  Mot. Disclose Informants (doc. no. 45) at 9.  At a

5    minimum, defendant asks that the court conduct an in camera hearing to determine the

6    reliability of the informants, and to allow defense counsel to question the informants,

7    citing *United States v. Anderson*, 509 F.2d 724 (9th Cir. 1974), which held as follows:

8         [R]ather than establishing a fixed rule that either requires or
          precludes disclosure of the informant's identity when probable
9         cause is in issue, we hold that the responsibility for striking the
          proper balance in each case rests with the trial judge.    In
10        striking that balance the trial judge, in the exercise of his
          discretion, can conduct an in camera hearing to which the
11        defense counsel, but not the defendant, is admitted.  The
          defense counsel could then be permitted to participate in the
12        in camera proceedings and to cross-examine the in camera
          witness or witnesses.
13

14   *Id.* at 729.  *See also United States v. Ordonez*, 737 F.2d 793, 809 (9th Cir. 1983) ("the

15   conducting of in camera proceedings, where disclosure is requested, is left to the

16   discretion of the trial court").

17        **2.    Public Interest Against Disclosure**

18        The government cites Ninth Circuit authority recognizing that the limited privilege

19   to withhold informants' identities "serves several important law enforcement objectives,

20   including encouraging citizens to supply the government with information concerning

21   crimes."  *United States v. Henderson,* 241 F.3d 638, 645 (9th Cir. 2000).  The Ninth

22   Circuit recognizes that the process due at a suppression hearing may be less elaborate

23   than the protections due the defendant at the trial itself and that disclosure of an

24   informant's identity is not always required where the sole ground for disclosure is to

25   challenge probable cause.  *United States v. Buffington*, 815 F.2d 1292, 1298-99 (9th Cir.

26   1987) (citing *United States v. Raddatz*, 447 U.S. 667, 679 (1980)).

27        In *McCray v. Illinois*, 386 U.S. 300, 313-14 (1967), the Supreme Court recognized

28   that the informant's privilege, in the context of suppression hearings, may preclude the

defendant from cross-examining the informant and, for that matter, from cross-examining officers regarding the informant's identity.  Under Ninth Circuit authority, it is well-settled "that 'a trial court need not require federal agents to disclose the identity of a reliable informant where the sole ground for seeking that information is to establish the existence of probable cause for arrest.'"  *United States v. Fixen*, 780 F.2d 1434, 1439 (9th Cir. 1986) (quoting *United States v. Mehciz*, 437 F.2d 145, 149 (9th Cir. 1971).  *See also McCray*, 386 U.S. at 311 ("Much less has the Court ever approached the formulation of a federal evidentiary rule of compulsory disclosure where the issue is the preliminary one of probable cause, and guilt or innocence is not at stake"); *United States v. Marshall*, 526 F.2d 1349, 1359 (9th Cir. 1975) (no right to disclosure of informant "who provided only information which, combined with other facts, gave the officers probable cause to arrest").

### 3.    Balancing Interests Under *Roviaro*

Here, the government has provided defense counsel with the substance of the informants' communications with law enforcement, minimizing defendant's need to obtain their identity to challenge probable cause.  Under the *Beltran* factors for weighing the competing interests under *Roviaro* as to each of the confidential sources, the court finds that the public interest against disclosure outweighs defendant's need to obtain each informant's identity.

### a.    Oakland CI

The Oakland CI played no role in the offense with which defendant is charged, is not a percipient witness, and will not be called to testify.  The government is not aware of any information that the Oakland CI possesses that would be relevant and helpful to the defense.  The government asserts a strong interest in nondisclosure: to keep the Oakland CI safe, to maintain the government's credibility with cooperating informants, and to preserve other investigations.  *See United States v. Napier*, 436 F.3d 1133, 1136 (9th Cir. 2006) (recognizing the government's interest in maintaining integrity of ongoing criminal investigations and ensuring the safety of the informant).

United States District Court
Northern District of California

1    The government suggests that the risk to the Oakland CI is greater here based on

2   defendant's association with a member of the Crips.  Defendant challenges this

3   contention, given that the only indication that defendant is associated with the Crips is

4   based on the CI's own uncorroborated allegation.  Because the record does not support a

5   strong inference that defendant has a gang affiliation, the risk of gang retaliation is not

6   given much weight.  However, the government represents that the Oakland CI is active in

7   ongoing investigations, presenting a strong interest against disclosure to preserve

8   ongoing and future investigations.

9    Furthermore, defendant's interest in disclosure is lessened here where defense

10   counsel has been provided with the content of the Oakland CI's communications with law

11   enforcement to challenge the sufficiency of the probable cause showing, unlike cases

12   where the government sought to protect even the content of the communications

13   because they tended to reveal the informant's identity.  *See Napier,* 436 F.3d at 1136

14   (recognizing that *Roviaro* protects more than just the name of the informant and extends

15   to information that would tend to reveal the identity of the informant); *U.S. v. Ellis*, No. 13-

16   CR-00818 PJH, 2015 WL 6551628, at *6 (N.D. Cal. Oct. 29, 2015) (determining that the

17   contents of the informant's communications with law enforcement may be withheld from

18   disclosure where the defendants' interest in challenging probable cause was outweighed

19   by the government's interest in nondisclosure of the informant's identity and information

20   that would tend to reveal the informant's identity).  Because the content of the

21   communications has been disclosed to defense counsel, defendant's ability to challenge

22   probable cause here has not been significantly compromised by nondisclosure of the

23   informant's identity.  *See Fixen*, 780 F.2d 1434 (affirming the probable cause

24   determination supporting the warrantless arrest, where the government disclosed the

25   information provided by the tipster that the police relied upon, without disclosing the

26   informant's identity).

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### b.    Airport Sources

With respect to the Cincinnati airport sources who tipped off law enforcement about defendant's flight information, SOI-1, and his rental car usage, SOI-2, neither informant was involved in the criminal activity, it seems apparent that they will not be called to testify, and the government is not aware that the SOI's provided any incriminating information about defendant.  Defendant questions the motivation of the Ohio SOIs to provide information to the government, such as monetary compensation or lenient treatment, but beyond the probable cause challenge, defendant has not shown how these Ohio SOIs possess information that would be relevant and helpful to the defense, or critical to a fair trial.  If the government learns of any exculpatory evidence, it would be bound by its *Brady* obligations to disclose such information.

### c.    Ohio Source

With respect to SOI-3, who confirmed to TFO Baker that Garnett was involved in drug trafficking, the government does not directly address the *Beltran* factors as to whether SOI-3 was involved in the drug trafficking activity, or whether SOI-3 may have been a percipient witness and would be called to testify.  From the face of the Equinox affidavit, however, there is no indication that SOI-3 provided incriminating information about defendant, and defendant does not show that he/she possessed information that would be relevant and helpful to the defense or critical to a fair trial.  If the government learns of any exculpatory evidence, it would be bound by its *Brady* obligations to disclose such information.  If the government determines that SOI-3 will be called to testify, then defendant may reopen the motion to disclose the identity of SOI-3 after first meeting and conferring with the government.

The government represents that all three Ohio SOIs remain active in current investigations, and that current and future investigations would be compromised if their identities were disclosed.  At this juncture, the public interest in nondisclosure outweighs defendant's interest in obtaining the Ohio SOIs' identities for challenging probable cause,

1  particularly where the content of their communications with law enforcement has already

2  been disclosed.

3          Having weighed defendant's interest in challenging probable cause, where none of

4  the informants will be called to testify at trial and the government has disclosed the

5  content of their communications with law enforcement, against the strong public interest

6  against disclosure, the court DENIES the motion for an order directing the government to

7  disclose the identity of the informants, to produce them for interviews, and to reveal their

8  locations.  Doc. no. 45.

9  **IV.     Motion to Suppress Evidence From Unlawful Stop and Prolonged Detention**

10         Defendant seeks an order suppressing all evidence obtained as a result of an

11  unlawful traffic stop, prolonged detention, de facto arrest, and warrantless search and

12  seizure of his person and vehicle on February 6, 2015.  Doc. no. 43.

13         **A.     Legal Standard**

14         The Fourth Amendment guarantees "[t]he right of the people to be secure in their

15  persons, houses, papers, and effects, against unreasonable searches and seizures."

16  U.S. Const. amend. IV.  Because stopping an automobile and detaining its occupants,

17  "even if only for a brief period and for a limited purpose," constitutes a "seizure" under the

18  Fourth Amendment, an official must have individualized "reasonable suspicion" of

19  unlawful conduct to carry out such a stop.  *Tarabochia v. Adkins*, 766 F.3d 1115, 1121

20  (9th Cir. 2014) (citing *Wren v. United States*, 517 U.S. 806, 809-10 (1996); *Delaware v.*

21  *Prouse*, 440 U.S. 648, 663 (1979); *United States v. Brignoni–Ponce*, 422 U.S. 873, 884-

22  86 (1975)).

23         "Reasonable suspicion" means "a particularized and objective basis for suspecting

24  the particular person stopped of criminal activity."  *United States v. Twillet*, 222 F.3d

25  1092, 1095 (9th Cir. 2000).  It is defined as a suspicion based on "specific and articulable

26  facts which, taken together with rational inferences from those facts," justify a police

27  intrusion.  *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  "The reasonable suspicion standard is

28  not a particularly high threshold to reach.  'Although . . . a mere hunch is insufficient to

United States District Court
Northern District of California

1    justify a stop, the likelihood of criminal activity need not rise to the level required for

2    probable cause, and it falls considerably short of satisfying a preponderance of the

3    evidence standard.'"  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013)

4    (en banc) (quoting *Arvizu*, 534 U.S. at 274).

5            In addition, when reviewing the record for the existence of reasonable suspicion,

6    "we 'must look at the totality of the circumstances.'"  *Valdes-Vega*, 738 F.3d at 1078

7    (quoting *Arvizu*, 534 U.S. at 274).  "This process allows officers to draw on their own

8    experience and specialized training to make inferences from and deductions about the

9    cumulative information available to them that might well elude an untrained person."

10   *Arvizu*, 534 U.S. at 273 (citations and internal quotation marks omitted).

**B.    Traffic Stop**

12           Defendant moves to suppress all evidence obtained directly or indirectly as the

13   result of the unlawful traffic stop on February 6, 2015, for lack of reasonable suspicion.

14   Officer Williams articulated two bases for conducting the stop of the Bentley: (1) that

15   there was "no plate" affixed to the rear of the vehicle, in violation of California Vehicle

16   Code § 5200; and (2) that he paced the Bentley traveling at approximately 75 mph in a

17   55 mph zone, a violation of California Vehicle Code § 22349(a).   Doc. no. 43.

18                           **1.    Missing License Plates**

19           Officer Williams reported that the Bentley did not have a license plate affixed to the

20   front or back of the vehicle in violation of Vehicle Code § 5200.  Section 5200 provides as

21   follows:

22                   (a) When two license plates are issued by the department for
                     use upon a vehicle, they shall be attached to the vehicle for
23                   which they were issued, one in the front and the other in the
                     rear.
24
                     (b) When only one license plate is issued for use upon a
25                   vehicle, it shall be attached to the rear thereof . . . .

26   Defendant contests this assertion, referring to photos taken during the search to

27   demonstrate that the Bentley displayed a dealer plate reading "California Wheels San

28   Jose" at the time of the stop, and had report-of-sale paperwork affixed to the lower-right

United States District Court
Northern District of California

1    corner of the front windscreen, permitting the lawful operation of the vehicle without

2    license plates or registration pursuant to California Vehicle Code § 4456(c).  Mot. Traffic

3    Stop (doc. no. 43), Ex. A.  Section 4456(c) provides that a vehicle displaying a copy of

4    the report of sale may be operated without license plates or registration card until either

5    (1) the license plates and registration card are received by the purchaser, or (2) a 90-day

6    period, commencing with the date of sale of the vehicle, has expired, whichever occurs

7    first.

8            The government responds that although defendant attempts to characterize the

9    "California Wheels San Jose" placard as a "dealer plate," Mot. Traffic Stop (doc. no. 43)

10   at 8, the picture of the placard distinctly shows that it was not an authorized dealer

11   license plate allowing a motor vehicle to operate on the roadway.  *Id.*, Ex. A.  Defendant

12   contends, however, that his vehicle displayed the "plates" of an automobile dealer no

13   different than those displayed on thousands of cars in California when freshly purchased

14   at any given time.  Reply (doc. no. 58) at 3:16-18.  Defendant cites no authority to

15   support his contention that the plate displayed on his car complied with the Vehicle Code.

16           Furthermore, the government contends that due to the heavily tinted windows,

17   Officer Williams was unable to see if the Bentley had a temporary registration sticker or

18   report of sale documentation attached to the front windshield and had reasonable

19   suspicion to pull the Bentley over to investigate further.  Defendant responds that

20   because the photos taken of the Bentley in its resting position after the stop clearly

21   demonstrate that the requisite report-of-sale paperwork was plainly visible, the extent that

22   the "no plate" formed the basis of a reasonable suspicion to detain the vehicle and its

23   occupants, that reasonable suspicion quickly dissipated.  Reply (doc. no. 58) at 3.  Under

24   the reasonable suspicion standard, however, an officer is not required to negate every

25   possible explanation of innocence before taking action.  *See United States. v. Tiong*, 224

26   F.3d 1136, 1140 (9th Cir. 2000) ("Despite a possible innocent explanation for every police

27   observation, a stop may be founded on reasonable suspicion."); *United States v.*

28   *Tuyakbayev*, No. 15-CR-00086-MEJ, 2015 WL 4692847, at *5 (N.D. Cal. Aug. 6, 2015).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendant asserts that the temporary registration for the Bentley was affixed to the

2   windshield in the lower right corner, and that it was visible to Officer Williams.  Lawson

3   Decl. (doc. no. 60) ¶ 6.  The government points out that the license plates for the Bentley

4   had been issued and were found in the trunk of the car, so that the exception under

5   4456(c) permitting operation of the car with only report of sale paperwork would not have

6   applied.  Opp. (doc. no. 51) at 8.  Even if the temporary registration papers were valid

7   and displayed on the windshield, the absence of any license plates affixed to the Bentley

8   justified an investigatory stop under the reasonable suspicion standard.  *See United*

9   *States v. Lopez*, No. C 08-00342 SI, 2008 WL 4820753, at *2 (N.D. Cal. Nov. 3, 2008)

10  (officer's observation that defendant's car did not have a front license plate supported

11  reasonable suspicion to justify the traffic stop), *aff'd*, 397 Fed. Appx. 338 (9th Cir. 2010).

12              **2.       Exceeding the Speed Limit**

13    Officer Williams paced the Bentley for approximately 200 yards and concluded that

14  defendant was traveling at a speed of approximately 75 mph in a 55 mph construction

15  zone, in violation of California Vehicle Code § 22349(a).  Arrest Report (doc. no. 51),

16  Exhibit A-1 at 2.  Defendant notes that Officer Williams does not have any radar evidence

17  of his actual speed, relying instead only upon his visual estimate.  Mot. Traffic Stop (doc.

18  no. 43) at 9.  Furthermore, even though Officer Williams noted in his police report that he

19  paced defendant as exceeding the speed limit, when he radioed in the stop to dispatch,

20  he described it as a "no plate," and not speeding.  *Id.*  Defendant asserts that it would

21  have been impossible for Officer Williams to "pace" him at approximately 75 mph given

22  the traffic conditions because Officer Lawson would not have been able to accelerate to a

23  speed of 75 mph given the traffic conditions in the span of two exits.  *Id.*  Defendant

24  admits he has no affirmative evidence of how fast he was going, but states that he was

25  merely traveling with the flow of traffic, which was traveling bumper to bumper at the

26  speed limit, and he argues that traffic was too thick on westbound I-580 at 9:30 a.m. on a

27  Friday morning to exceed 55 mph.  *Id.*; Lawson Decl. (doc. no. 60) ¶ 4.

28

1    The record reflects that Officer Williams' suspicion that defendant was speeding

2    was not premised on a mere hunch, but rather, Officer Williams supported his visual

3    estimate by pacing the vehicle, which indicated that defendant was traveling in excess of

4    75 MPH in a 55 MPH construction zone.  Further, he found the difference between the

5    estimated speed and the legal speed limit to be an estimated 20 MPH.  These

6    observations support the reasonableness of Officer Williams' belief that defendant was

7    speeding.  *See Tuyakbayev*, 2015 WL 4692847, at *5 (officer's visual estimate that the

8    defendant was driving at 20 mph above the speed limit, combined with hearing a loud

9    engine accelerating toward him, supported reasonable suspicion to conduct an

10   investigatory stop).

         **3.    Pretextual Stop**

12   Defendant further challenges the traffic stop for Vehicle Code violations as

13   pretextual, informed and assisted by DEA agents monitoring defendant's movements.

14   He argues that Officer Williams was called upon by the DEA to improperly stop a vehicle

15   which they were currently tracking and maintaining "mobile surveillance" of, in a fishing

16   expedition for evidence of narcotics trafficking that their multi-year and multi-agency

17   investigation had failed to provide.  Mot. Traffic Stop (doc. no. 43) at 9.  The government

18   does not dispute that Officer Williams was asked to perform a traffic stop on the Bentley.

19   Williams Decl. (doc. no. 51) ¶ 2.  Even if the traffic stop served "some other purpose,"

20   reasonable suspicion to believe that a traffic violation occurred is sufficient to justify an

21   investigatory stop.  *United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005) (citing

22   *Whren v. United States*, 517 U.S. 806, 810, 813 (1996)).  *See United States v. Choudhry*,

23   461 F.3d 1097, 1101-02 (9th Cir. 2006).  In *Whren v. United States*, the Supreme Court

24   "specifically declined to hold that the Fourth Amendment test for traffic stops should be

25   'whether a police officer, acting reasonably, would have made the stop for the reason

26   given.'"  *Willis*, 431 F.3d at 715 (quoting *Whren v. United States*, 517 U.S. 806, 810, 813

27   (1996)).

28

United States District Court
Northern District of California

1  Defendant also raises the possibility that this was a racially motivated stop of an

2  African-American male driving an expensive car, Mot. Traffic Stop (doc. no. 43) at 10, but

3  the record reflects that Officer Williams stopped defendant at the request of the DEA as

4  part of an investigation, not due to racial animus.  Because Officer Williams had

5  reasonable suspicion to believe that defendant violated provisions of the Vehicle Code,

6  the traffic stop was reasonable.

7  **C.    Prolonged Detention**

8  Defendant contends that even if the traffic stop was initially justified, Officer

9  Williams's line of questioning unreasonably prolonged the stop and became an

10  unreasonable seizure, citing *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

11  Even a seizure that is lawful "can violate the Fourth Amendment if its manner of

12  execution unreasonably infringes on interests protected by the Constitution."  *Illinois v.*

13  *Caballes*, 543 U.S. 405, 407 (2005).  In *Rodriguez*, the Supreme Court held:

> Like a *Terry* stop, the tolerable duration of police inquiries in
> the traffic-stop context is determined by the seizure's
> "mission" - to address the traffic violation that warranted the
> stop and attend to related safety concerns.    Because
> addressing the infraction is the purpose of the stop, it may
> "last no longer than is necessary to effectuate th[at] purpose."
> Authority for the seizure thus ends when tasks tied to the
> traffic infraction are - or reasonably should have been -
> completed.

19  *Rodriguez*, 135 S. Ct. at 1614 (internal citations omitted).  The Court in *Rodriguez*

20  explained that "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not

21  measurably extend the duration of the stop."  *Id.* at 1615 (quoting *Arizona v. Johnson*,

22  555 U.S. 323, 333 (2009)).  "An officer, in other words, may conduct certain unrelated

23  checks during an otherwise lawful traffic stop[, but] may not do so in a way that prolongs

24  the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an

25  individual."  *Id.* at 1615.  *See also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding that

26  "mere police questioning does not constitute a seizure" unless it prolongs the detention of

27  the individual; thus, no reasonable suspicion is required to justify questioning that does

28  not prolong the stop).

United States District Court
Northern District of California

41

United States District Court
Northern District of California

### 1.     Traffic Stop Was Not Unreasonably Prolonged

Defendant contends that Officer Williams unreasonably prolonged the traffic stop after pulling over defendant and articulating his stated reasons for doing so, by interrogating defendant inappropriately for an undue amount of time about his travels, his employment, and his vehicle.  Mot. Traffic Stop (doc. no. 43) at 13.  Defendant points out that Officer Williams did not even begin the process of writing a ticket for speeding or missing license plates.

Officer Williams states his belief that it took less than five minutes between the initiation of the traffic stop and obtaining defendant's consent to search the vehicle.  Williams Decl. (doc. no. 51) ¶ 3.  Defendant argues that Officer Williams reasonably should have completed the process of dealing with the alleged Vehicle Code violations within five minutes, and that the "casual conversation" and inquiries prolonged the traffic stop beyond the time reasonably required to issue a ticket.  Reply (doc. no. 58) at 4.  Defendant cites the CAD dispatch recording which indicates that the probation/parole check on Lawson came back clean at approximately seven minutes into the stop.  Mot. Traffic Stop (doc. no. 43) at 12-13.  Defendant also states that approximately 20 minutes after the stop was made, Officer Williams radioed to dispatch that he had entered the trunk of the vehicle and located a license plate.  *Id.* at 13.  The parties did not submit the CAD records to the court, but the government does not dispute defendant's representation about this time frame.   Defendant states that he estimates that the duration of the traffic stop and search of his car was about 20 minutes.  Lawson Decl. (doc. no. 60) ¶ 12.

Ninth Circuit authority recognizes that "officers are not required to move at top speed when executing a lawful traffic stop," and are not prohibited from taking a brief pause to ask a few questions unrelated to the purpose of the traffic stop, as long as the traffic stop is not unreasonably prolonged under the totality of the circumstances.  *See United States v. Turvin*, 517 F.3d 1097, 1101-02 (9th Cir. 2008) (holding that an officer who stopped writing out traffic citations to turn on a tape recorder and ask the defendant

42

about drugs and for consent to search his vehicle did not unreasonably prolong the traffic

stop).  In *Turvin*, the total duration of the traffic stop up to the point when the defendant

consented to the search was about 14 minutes.  *Turvin*, 517 F.3d at 1101.  The court in

*Turvin* concluded that this was no longer than an ordinary traffic stop and that evidentiary

findings were not necessary "to demonstrate the sensible observation that fourteen

minutes is not unreasonably long for a traffic stop."  *Id.*  Similarly, in *United States v.*

*Mendez*, 476 F.3d 1077 (9th Cir. 2007), the court held that the officers' questioning did

not unreasonably prolong the duration of a lawful stop, where the entire encounter

between the police and the motorist up to the time of the arrest and search took

approximately eight minutes, and the questioning occurred while the police detective was

running an identification check.  *Mendez*, 476 F.3d at 1079-81.

Here, the record demonstrates that Officer Williams's questioning was of some

duration up to 20 minutes after the initial stop, at which point defendant was sitting on the

curb and Officer Williams had searched the trunk of defendant's car and reported finding

a license plate inside.  Mot. Traffic Stop (doc. no. 43) at 13.  Although there is a factual

dispute as to the duration of the stop prior to the search of the car, even if taking

defendant's estimate as accurate, a 20-minute traffic stop, like the 14-minute traffic stop

in *Turvin,* is not unreasonably prolonged under the circumstances.  In particular, Officer

Williams ran a probation/parole check during the time that Officer Williams questioned

defendant and asked for consent to search, as in *Mendez*, and had to wait about 7

minutes for the results.

### 2.    Reasonable Suspicion

Even if it could be said that the questioning by Officer Williams unreasonably

prolonged the traffic stop, the questioning was justified by reasonable suspicion that

defendant was involved in other criminal activity.  *See Turvin*, 517 F.3d at 1099-1100;

*Mendez*, 476 F.3d at 1081.

Here, as in *Turvin*, it was reasonable for Officer Williams to ask questions based

on information learned during the course of the stop.  *Turvin*, 517 F.3d at 1102.  Officer

Williams' questions and request to search were reasonable based on facts learned and observations made after he stopped defendant.  As stated in his report, Officer Williams detailed three factors supporting reasonable suspicion of criminal activity to further investigate: (1) absence of luggage, given that defendant stated that he spent the last three weeks in Los Angeles; (2) defendant's stated employment as an entertainer and iron worker, jobs which did not usually pay enough to afford the expense of a Bentley; and (3) Officer Williams's knowledge that Interstate 580 was a well-known drug trafficking route from Los Angeles to San Francisco.  Arrest Report (doc. no. 51) at LAWSON-0031.  Courts have consistently held that inconsistent, vague or evasive stories about travel plans are suspicious factors, such as taking a long distance trip by automobile for only a short stay.  *United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000).  *See also United States v. Garcia*, 205 F.3d 1182, 1185 (9th Cir. 2000).  Viewed under the totality of the circumstances, Officer Williams's observations supported an articulable and reasonable suspicion to continue questioning defendant.

>    **D.**    **De Facto Arrest**

Defendant contends that he was detained during the traffic stop in such a manner as to constitute a de facto arrest unsupported by probable cause:

> Immediately upon approaching the car, Officer Williams removed any question that Mr. Lawson was free to leave by demanding that he hand over his keys and roll down all the windows.  Thereafter, Officer Williams engaged in an accusatory line of questioning wholly unrelated to the purported purpose of the stop.  After crudely insinuating that the Bentley was too nice of a vehicle for a man like Lawson to drive, Williams ordered Lawson out of the vehicle, removed his belongs from his person, and made him sit on the curb and watch as he rifled through Lawson's belongings.  Detective Al Grejada stood over Lawson as this occurred.  Mr. Lawson was outnumbered, intimidated by an undue show of authority, and uninformed of his rights.

Mot. Traffic Stop (doc. no. 43) at 14-15.

To determine whether a detention exceeds the bounds of an investigatory stop and amounts to a de facto arrest, courts look to the totality of the circumstances.  *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990).  "'Whether an arrest has

44

United States District Court
Northern District of California

1    occurred depends on all the surrounding circumstances, including the extent to which

2    liberty of movement is curtailed and the type of force or authority employed.'"  *Id.* at 340

3    (quoting *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987)).  In *Ricardo D.*,

4    cited by defendant, the Ninth Circuit held that the coercive nature of an investigatory stop

5    amounted to a de facto arrest lacking probable cause, where the suspect was confronted

6    by several officers with high beams of a police car shining in his face, and "the suspect

7    was sixteen, taken by the arm, told not to run, and placed in the back of the police car."

8    *Id.*

9         Here, defendant's traffic stop did not have the coercive nature that was found in

10    *Ricardo D.* to transform the stop into an arrest.  Officer Williams was alone when he

11    approached defendant, not in the presence of multiple officers, and did not call for

12    backup until obtaining consent to search the car; nor was defendant held in the back of

13    the patrol car or handcuffed.  Under the circumstances presented here, the traffic stop

14    and questioning, leading up to the search of defendant's person and his car, did not

15    amount to a de facto arrest.

16         **E.      Search of Defendant's Person and Vehicle**

17         Defendant seeks suppression of all the evidence seized from his person and from

18    inside the Bentley.  He contends that he did not consent to Officer Williams's search of

19    his person or his vehicle, and that Officer Williams did not have probable cause to

20    conduct the search.  As set forth below, the court finds contested issues of fact on the

21    question whether defendant gave consent to search, and GRANTS defendant's request

22    for an evidentiary hearing on that issue.

23         **1.      Factual Dispute re: Consent**

24         Officer Williams reported that defendant gave consent to search his person and

25    his vehicle:

26         > I then asked Lawson if he had anything illegal on him or in his
         > vehicle.  Lawson told me he did not have anything illegal on
27         > him.  I then asked him if he would mind if [sic] searched his
         > him [sic] and his vehicle.  Without hesitation, Lawson stated
28         > "Go ahead, I don't have anything in my car."

1    Williams Decl., Ex. A-1 (doc. no. 51) at LAWSON-0031.  *See United States v. Vongxay*,

2    594 F.3d 1111, 1119 (9th Cir. 2010) ("The government bears the burden of proving

3    consent, and it must prove that the consent was freely and voluntarily given.") (citations

4    omitted).  Furthermore, to corroborate Williams's police report, the government submitted

5    a CD recording of the questioning at the police station, where Officer Williams asked

6    defendant, "as far as talking at the window, you gave me consent to get into the car?"

7    and Lawson responded, "Right.  I don't need this . . . I'm so pissed off right now, I don't

8    even feel like going through none of this right now."  Williams Decl. ¶ 5 and Ex. A-4 (CD)

9    (doc. no. 51).

10          Defendant denies that he gave consent and argues generally that "he would have

11   had to have taken leave of his faculties to give his consent to search."  Reply (doc. no.

12   58) at 8.  In his late-filed declaration, defendant denies ever giving anyone consent to

13   search his vehicle.  Lawson Decl. (doc. no. 60) ¶ 11.

14          Defendant's statements to Officer Williams, both as recorded in the police report

15   and on tape at the police station, tend to establish that defendant consented to a search

16   of his car, but are ambiguous as to whether defendant consented to a search of his

17   person.  *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring

18   the scope of a suspect's consent under the Fourth Amendment is that of "objective"

19   reasonableness - what would the typical reasonable person have understood by the

20   exchange between the officer and the suspect?").  In light of defendant's express denial

21   that he gave consent to search his car or his person, defendant has sufficiently

22   demonstrated a contested issue of fact on whether he gave consent to the search, either

23   of his person or of his car.  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000)

24   ("An evidentiary hearing on a motion to suppress need be held only when the moving

25   papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial

26   court to conclude that contested issues of fact exist.").  As the factual dispute over

27   consent does not challenge an officer's sworn statement in support of a search warrant

28   affidavit, Officer Williams's factual statements are not entitled to a presumption of validity

46

1   under *Franks*, and defendant is not required to make a preliminary showing of falsity and

2   materiality to be entitled to an evidentiary hearing.

3        Given the factual dispute whether defendant consented to a search, the court finds

4   that an evidentiary hearing is warranted on whether defendant gave consent to search

5   his person or his car.

6        **2.    Probable Cause**

7        The government argues in the alternative that even if defendant did not give

8   consent to search the Bentley, Officer Williams had probable cause to search, justifying

9   the warrantless search of both defendant's person and his car.  To establish probable

10   cause, the government must show a fair probability that contraband or evidence of a

11   crime was in the place to be searched.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

12        Here, the government asserts that Officer Williams acted based on directions

13   given to him by Detective Grejada, who in turn received information from DEA Special

14   Agent Pettie Winston.  Agent Winston submitted the probable cause affidavit in support of

15   the application to install a GPS tracking device on defendant's Bentley.  *See* Sealed

16   Winston Affidavit.  Agent Winston also attests to the following facts:

> During the evening on February 5, 2015, agents were monitoring GPS information from a court-authorized GPS tracking device placed on Lawson's 2006 white Bentley ("the Bentley").  Agents observed that the tracker data for the Bentley showed that the defendant had driven from the Bay Area to the Los Angeles area.
>
> On February 6, 2015, at approximately 7:15 a.m., I was monitoring the GPS tracker data for the Bentley.  Based on the GPS information, it appeared that Lawson was driving back to the Bay Area from Los Angeles.  I placed a telephone call to Livermore Police Detective Al Grejada and informed him about the DEA's investigation into Lawson.  I told Detective Grejada that the DEA currently had an active GPS tracker on the Bentley and I anticipated that Lawson would likely drive through the Livermore area on Interstate 580.  I provided Detective Grejada with a detailed description of the Bentley.  I also told Detective Grejada that I anticipated that the Bentley would contain illegal drugs or drug proceeds.  I also requested that Detective Grejada have an officer from the Livermore Police Department perform a traffic stop on the Bentley if it drove through his jurisdiction.

Opp. to Mot. Suppress Unlawful Stop and Prolonged Detention, Ex. B ("Winston Decl.") ¶¶ 3-4 (doc. no. 51). The government argues that under the collective knowledge doctrine, the information known to Agent Winston is imputed to Officer Williams, based on Agent Winston's communication with the Livermore Police requesting a traffic stop. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (recognizing that the collective knowledge doctrine applies "where an officer with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion directs or requests that another officer conduct a stop, search or arrest.") (internal marks omitted) (quoting *United States v. Ramirez,* 473 F.3d 1026, 1033 (9th Cir. 2007)).

Defendant does not appear to dispute the applicability of the collective knowledge doctrine to impute Agent Winston's knowledge to Officer Williams, but defendant contends that the information possessed by Agent Winston did not rise to the level of probable cause to search his person or his vehicle. Defendant argues persuasively that even if Agent Winston believed there was probable cause to install a GPS tracker on defendant's Bentley, the record does not reflect any additional information, since the time when the tracking warrant was issued, to support probable cause to search the Bentley, other than the fact that defendant was returning from Los Angeles at the time of the traffic stop. The record before the court on the information known to Agent Winston is limited to Agent Winston's declaration and the December 29, 2014, search warrant affidavit for the GPS tracker on the Bentley, which established probable cause to believe that defendant was engaged in drug trafficking and that tracking his car would provide evidence of illegal activity in December 2014 when the search warrant was issued, but does not articulate the factual basis for probable cause to believe that evidence of criminal activity would be found on defendant's person or in the Bentley in February 2015.

### a.    Search of Defendant's Pants Pockets

With respect to Officer Williams's search of defendant's pants where cash was located in the right front pocket and left rear pocket, the government does not specifically address whether there was probable cause to search defendant's person. Agent

48

Winston's declaration makes a conclusory statement that "I anticipated that the Bentley would contain illegal drugs or drug proceeds," but falls short of stating a belief that defendant would be carrying drug proceeds on his person or setting forth facts to support that belief.  Winston Decl. ¶ 4 (doc. no. 51).  The only evidence linking defendant to drug trafficking between Los Angeles and the Bay Area was the confidential informant's statements during a December 9, 2014 interview, stating that defendant told the CI on November 30, 2014, that he was driving to Los Angeles to pick up bricks, and that he was coming back to Hayward that same day.  The government offers no further evidence discovered during the course of the investigation to support probable cause that drugs or drug proceeds would be found on defendant 2 months later, when he was stopped on his way back from Los Angeles on February 6, 2015, or any evidence that every time that defendant drove to Los Angeles he went to obtain drugs or would carry large sums of money.  Given this time gap, a sufficient nexus is lacking between the information set forth in the December 29, 2014 affidavit and the February 6, 2015 traffic stop to support a fair probability that evidence of a crime would be found on defendant's person.  *See United States v. Crews*, 502 F.3d 1130, 1136-37 (9th Cir. 2007) ("For probable cause, an affidavit must establish a reasonable nexus between the crime or evidence and the location to be searched.").  On this record, the government has not met its burden to show probable cause to search defendant's person.

### b.       Search of Bentley

Under the automobile exception to the warrant requirement, police officers may "conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband." *United States v. Pinela–Hernandez*, 262 F.3d 974, 977–78 (9th Cir. 2001).  "A determination of probable cause is based on the 'totality of the circumstances' known to the officers, and because the officers were acting in concert in this case, we 'look to the collective knowledge of all the officers involved in the criminal investigation.'" *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015) (quoting

49

*United States v. Ramirez*, 473 F.3d 1026, 1032–37 (9th Cir. 2007); *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)).

As discussed above, the only evidence in the record linking defendant to drug trafficking between Los Angeles and the Bay Area was the confidential informant's statements during a December 9, 2014 interview, stating that defendant told the CI on November 30, 2014, that he was driving to Los Angeles to pick up bricks, and that he was coming back to Hayward that same day.  The government offers no further evidence discovered during the course of the investigation to support probable cause that drugs or drug proceeds would be found on defendant over 2 months later, when he was stopped on his way back from Los Angeles on February 6, 2015.  Without offering evidence that the DEA may have obtained between December 9, 2014 and February 6, 2015, the government does not establish a sufficient nexus between defendant's car and the past indicia of drug trafficking activity to support a fair probability that evidence of a crime would be found in the Bentley.

In explaining why he wanted to conduct the consent search, Officer Williams stated, "I wanted to search the car based on the following factors: Lawson was traveling to and from the Los Angeles Area to the Bay Area without any luggage, his employment usually not paying enough for him to afford the vehicle he was driving and knowing that the highway 580 corridor was being a known drug trafficking route from LA to San Francisco."  These observations supported reasonable suspicion to justify further investigation, but in light of the facts in the record, these suspicious factors do not establish probable cause to search the car without consent.

### c.     Evidentiary Hearing

On the present record, the warrantless search of defendant's person and car, in the absence of consent to the search, was not supported by probable cause.  Because it is the government's burden to show probable cause, and defendant raised the factual dispute in an untimely declaration, the court will grant an evidentiary hearing to establish probable cause for the warrantless search of defendant's person and car.  The

United States District Court
Northern District of California

1   government may, if it chooses, attempt to establish probable cause for the search at the

2   evidentiary hearing to be held on the limited factual disputes raised by defendant.

3   **V.      Motion to Suppress Incriminating Statements**

4          **A.      Legal Standard**

5          *Miranda* requires that a suspect be advised of his Fifth Amendment rights before a

6   custodial interrogation.  *Miranda v. Arizona,* 384 U.S. 436, 444-45 (1966).  A suspect who

7   has not been formally taken into police custody can nevertheless be considered "in

8   custody" for purposes of *Miranda* if the suspect has been deprived of his freedom in any

9   significant way.  *Id.* at 444.  "Whether a suspect is in custody turns on whether there is a

10   'formal arrest or restraint on freedom of movement of the degree associated with a formal

11   arrest.'"  *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc)

12   (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)) (internal marks

13   and citation omitted).

14          To determine whether a suspect was in custody, a court must first examine the

15   totality of the circumstances surrounding the interrogation.  *Thompson v. Keohan,* 516

16   U.S. 99, 112 (1995).  The court must then ask whether a reasonable person in those

17   circumstances would have felt he or she was not at liberty to terminate the interrogation

18   and leave.  *Id.*  The Ninth Circuit has identified five factors relevant to the custody

19   determination:  (1) the language used to summon the individual; (2) the extent to which

20   the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

21   interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to

22   detain the individual.  *United States v. Bassignani,* 575 F.3d 879, 883 (9th Cir. 2009)

23   (quoting *United States v. Kim,* 292 F.3d 969, 974 (2002)).

24          Ordinarily, *Terry* traffic stops are considered non-custodial for purposes of

25   Miranda.  *Berkemer v. McCarty,* 468 U.S. 420, 437 (1984).  A person detained as a result

26   of a traffic stop is not in custody because such detention does not significantly impair the

27   detained person's free exercise of his privilege against self-incrimination to require that

28   he be warned of his constitutional rights.  *Id.*

United States District Court
Northern District of California

1

**B.      Discussion**

2

**1.      Custody Determination**

3      Defendant moves to suppress all statements attributed to him at the scene of the

4   traffic stop as well as at the police station and the fruits thereof on the ground that the

5   statements were made in violation of defendant's privilege against self-incrimination and

6   the right to assistance of counsel.  Mot. (doc. no. 44).  Defendant argues that the

7   statements were obtained from him as the result of a custodial interrogation without

8   *Miranda* warnings.

9      With respect to the statements made by defendant, the government only intends to

10   introduce those statements made prior to the search of the vehicle.  Regarding the

11   statements made after the search of the vehicle and at the Livermore Police Station, the

12   government states that it does not intend to use those statements at trial.  Therefore, the

13   government is precluded from introducing those statements at trial and the court

14   proceeds to consider defendant's motion to suppress only with respect to the statements

15   made before Officer Williams conducted the search of the vehicle.  Those statements, as

16   described in Officer Williams's arrest report (doc. no. 51 at LAWSON-0031), are as

17   follows:

18         •   Officer Williams informed defendant of his reason for the

19              enforcement stop and defendant responded that he was unaware

20              of how fast he was driving.

21         •   Officer Williams then asked defendant where he was coming from

22              and defendant informed that he was coming from the Los Angeles

23              area on his way to Hayward.

24         •   Officer Williams asked what defendant was doing in Los Angeles

25              and he answered that he works there as an entertainer at clubs and

26              that he is an iron worker in the Bay Area.

27

28

United States District Court
Northern District of California

- Officer Williams further inquired how long defendant had been in Los Angeles and defendant replied he had been there for three weeks.

- Officer Williams told defendant that for having been in Los Angeles for three weeks, he did not see any luggage in the vehicle; defendant responded by pointing to a Louis Vuitton duffle bag that was lying in the front passenger seat and saying that he had been driving back and forth so he didn't take too much with him.

- During the conversation, Officer Williams complimented defendant on how nice his vehicle was and how clean he kept it.  Officer Williams then stated that defendant must have paid a fortune for the vehicle because it was a Bentley, and defendant responded that it was only a 2006 model and that he pays around $470 a month for it.

- Officer Williams asked defendant if he was on parole or probation and defendant responded that he had not been in trouble in a long time.  Defendant further explained that he had been arrested in Los Angeles and San Jose a while ago.

- Officer Williams then asked if defendant had anything illegal on him or in his vehicle, and defendant responded that he did not have anything illegal on him.

- Officer Williams then asked defendant if he would mind if Officer Williams searched him and his vehicle.  According to the arrest report, defendant responded, "Go ahead, I don't have anything in my car."  Arrest Report (doc. no. 51) at LAWSON-0031.  Defendant disputes that he ever gave anyone consent to enter or search any part of his vehicle.  Lawson Decl. (doc. no. 60) ¶ 11.

The government argues that weighing the five factors under the *Kim* test for determining whether an individual was in custody, defendant's pre-search interrogation was not custodial and did not require *Miranda* warnings.  Although some of defendant's statements do not appear to be incriminatory at all, the government takes the position that some of statements demonstrate that defendant lied to Williams and are likely to be relevant at trial.

Applying the Ninth Circuit test under *Kim* for whether the interrogation was custodial, the court finds that defendant has sufficiently demonstrated that disputed issues of fact, with respect to the language used and manner of summoning defendant and the degree of pressure applied by Officer Williams, warrant an evidentiary hearing. The other *Kim* factors are not subject to genuine factual dispute and weigh against a finding that the interrogation was custodial.

### a.      Factual Dispute re: Language Used to Summon

The first *Kim* factor analyzes the language used to summon the individual. Defendant states that Officer Williams approached defendant with his hand on his gun, yelling at defendant to hand over his keys and to roll down all of his windows.  Lawson Decl. (doc. no. 60) ¶ 8.  Officer Williams's arrest report does not indicate whether his hand was on his gun when he contacted defendant, whether he ordered defendant to turn over his keys, or what his tone of voice was during the initial contact and questioning.  Nor does it indicate the timing of when Officer Williams took defendant's car keys; the arrest report only indicates that Officer Williams had the car keys when he opened the trunk with the key fob.  Arrest Report (doc. no. 51) at LAWSON-0032.  On this record, the court cannot adequately weigh this factor under the Ninth Circuit test for custodial interrogation.

### b.      Extent of Confrontation with Evidence of Guilt

The second *Kim* factor analyzes the extent to which defendant was confronted with evidence of guilt.  Defendant contends that the entire traffic stop was "pretextual," as Agent Winston suspected that defendant's vehicle would contain controlled substances.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Reply (doc. no. 57) at 3.  In light of this, defendant argues that the line of aggressive

2   questioning related to his travel, employment, and contents of the vehicle was designed

3   to get defendant to incriminate himself.  *Id.*  The government asserts that when Officer

4   Williams made contact with defendant, he willingly answered the line of questioning about

5   where he was travelling from, how long he had been there, whether or not he was on

6   probation, and if he had anything illegal on him.  Opp. (doc. no. 49) at 3.  *Id.*

7          The extent to which a defendant is confronted with evidence of guilt is premised

8   upon whether the interrogator adopts an aggressive, coercive, or deceptive tone.  *United*

9   *States v. Bassignani,* 575 F.3d 879, 884 (9th Cir. 1985).  *See United States v. Beraun-*

10  *Panez,* 812 F.2d 578, 579 (9th Cir. 1987) (finding that the defendant was in custody

11  where the officers falsely told the defendant that a witness placed him at the scene of the

12  crime as a way to get the defendant to incriminate himself).  Here, defendant does not

13  contend that Officer Williams made false suggestions of guilt to trick him into admitting

14  criminal conduct, as in *Beraun-Panez*, or otherwise accused defendant of drug trafficking.

15  Whether Officer Williams intended to ask incriminating questions, as defendant asserts,

16  is not relevant to determining whether defendant was in custody during the interval of

17  time between the initial stop and Officer Williams's search.  "A policeman's unarticulated

18  plan has no bearing on the question whether a suspect was 'in custody' at a particular

19  time; the only relevant inquiry is how a reasonable man in the suspect's position would

20  have understood the situation."  *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984).  In

21  *Berkemer*, the Court held that the defendant was not exposed to custodial interrogation at

22  the scene of the traffic stop, prior to being placed under arrest for driving under the

23  influence, where a single police officer asked the defendant a modest number of

24  questions and asked him to perform a simple balancing test at a location visible to

25  passing motorists.  *See United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005) (finding

26  that the defendant was not in custody when the officers "did not attempt to challenge the

27  defendant's statements with other 'known' facts suggesting his guilt[, but] merely asked

28  [him] about the allegations").  Here, as in *Norris*, there is no evidence that Officer

1  Williams challenged defendant's statements with facts suggesting guilt.  This factor

2  weighs against finding that defendant was in custody when he was being questioned by

3  Officer Williams before the search of the car.

### c.        Physical Surrounding of the Interrogation

5        The third *Kim* factor addresses the physical surroundings of the interrogation.  The

6  Supreme Court has noted that, "the exposure to public view both reduces the ability of an

7  unscrupulous policeman to use illegitimate means to elicit self-incriminating statements

8  and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to

9  abuse." *Berkemer,* 468 U.S. at 438.  Defendant asserts that the detention occurred at

10  the intersection of Bluebell Drive and Springtown Boulevard, a location not on the side of

11  I-580, but rather in a remote section of Livermore, California which is reached by exiting

12  the freeway via off-ramp and traveling onto city streets to reach this location.  Reply (doc.

13  no. 57) at 3.  The location of the traffic stop, identified by defendant as "the city streets in

14  Livermore," is not in a remote or rural area where no passerby would likely be present,

15  but is just off the freeway.  Lawson Decl. (doc. no. 60) ¶ 7.  The court also notes that the

16  traffic stop occurred in broad daylight.  Under these circumstances, the physical

17  surrounding of the traffic stop weighs against a finding of custodial interrogation.

### d.        Duration of the Detention

19        Related to the fourth *Kim* factor, the court has determined, in Section IV.C above,

20  that even if defendant correctly estimates that the traffic stop lasted 20 minutes up to the

21  search of the car, the interrogation was not unreasonably prolonged.  Focusing the

22  custodial inquiry under *Kim* on the duration of the detention before Officer Williams

23  searched the car, which lasted 20 minutes at most, defendant's traffic stop lasted less

24  than half the time of the 45- to 90-minute interrogation at issue in *Kim*, where the court of

25  appeals found that the defendant was in custody.  *Kim*, 292 F.3d at 972.  In other cases,

26  the Ninth Circuit has found a defendant not in custody when he was questioned for "more

27  than one hour," *United States v. Crawford*, 372 F.3d 1048, 1052 (9th Cir. 2004) (en

28  banc), and "approximately 45 minutes."  *United States v. Norris*, 428 F.3d 907, 911 (9th

United States District Court
Northern District of California

1   Cir. 2005).  Under *Crawford* and *Norris*, the duration of the questioning before Officer

2   Williams searched the car, which was at most 20 minutes, weighs against finding that

3   defendant was in custody.

4                    **e.     Factual Dispute re: Degree of Pressure**

5          The fifth *Kim* factor addresses the degree of pressure applied to the individual by

6   an officer during the course of a detention.  "Strong but reasonable measures to insure

7   the safety of the officers or the public can be taken without necessarily compelling a

8   finding that the suspect was in custody." *United States v. Booth*, 669 F.2d 1231, 1236

9   (9th Cir. 1981) (concluding that the defendant was in custody for *Miranda* purposes

10  where he was told that he matched the description of a suspected bank robber, he was

11  searched for weapons and handcuffed, and a police car was requested to transport him).

12         Defendant states in his late-filed declaration that Officer Williams approached his

13  vehicle with his hand on his gun, yelling at defendant to roll down the windows.  Lawson

14  Decl. (doc. no. 60) ¶ 8.  Defendant asserts that he was forced to hand over his keys and

15  ordered out of his vehicle.  *Id.* ¶¶ 8, 9.  The arrest report does not refer to whether Officer

16  Williams had his hand on his gun or asked defendant to hand over his keys when he

17  approached defendant's car or any time during the questioning before searching the

18  Bentley.  There is also no indication that Officer Williams expressly told defendant that he

19  was not under arrest.  *Cf. United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009)

20  ("We have consistently held that a defendant is not in custody when officers tell him that

21  he is not under arrest and is free to leave at any time.").  Further, defendant asserts that

22  Officer Williams ordered defendant to sit on the curb with his legs stretched out in front of

23  him while Officer Grejada stood over him, *id.* ¶ 10, but the evidence shows that Officer

24  Williams ordered defendant to sit on the curb after initiating the search and the

25  government concedes it will not introduce any statements from that point.  Arrest Report

26  (doc. no. 51) at LAWSON-0031.

27         Defendant has raised a factual issue over the degree of pressure applied by

28  Officer Williams during the interval between the initial stop and the search of the Bentley,

United States District Court
Northern District of California

57

1    particularly as to whether Officer Williams had his hand on his gun and whether he took

2    defendant's keys before questioning him.  The question over who had possession of the

3    car keys could weigh heavily in determining whether a reasonable innocent person under

4    the circumstances would conclude that after brief questioning he would be free to leave.

5    *See Bassignani*, 575 F.3d at 887 (quoting *Booth*, 669 F.2d at 1235).  Yet, the record is

6    unclear as to the sequence of events, as well as the actions taken by Officer Williams

7    during the course of the traffic stop, which are necessary to assess the degree of

8    pressure applied to defendant.  Accordingly, the court GRANTS defendant's request for

9    an evidentiary hearing on this issue.

10    **VI.**    **CONCLUSION**

11      For the reasons set forth above, the court rules as follows:

12      1.  The motion to suppress evidence obtained pursuant to the Captiva tracking

13    warrant, and for *Franks* hearing, is DENIED (doc. no. 39);

14      2.  The motion to suppress evidence obtained pursuant to the Equinox tracking

15    warrant, and for *Franks* hearing, is DENIED (doc no. 40);

16      3.  The motion to suppress evidence obtained pursuant to the UPS package

17    warrant, and for *Franks* hearing, is DENIED (doc. no. 41);

18      4.  The motion to suppress evidence obtained pursuant to the Bentley GPS

19    tracking warrant, and for *Franks* hearing, is DENIED (doc. no. 42);

20      5.  The motion to disclose the identity of confidential sources and informants is

21    DENIED (doc. no. 45).

22      6.  The motion to suppress with respect to evidence seized as the result of

23    unlawful traffic stop, prolonged detention or de facto arrest, and for evidentiary hearing, is

24    DENIED IN PART (doc. no. 43).

25      The ruling on the motion to suppress with respect to evidence seized during the

26    warrantless search of defendant's person and car is DEFERRED, and defendant's

27    request for evidentiary hearing on the limited issue of whether defendant consented to

28    the search is GRANTED (doc. no. 43).

United States District Court
Northern District of California

1         If the government elects to present evidence at the evidentiary hearing on the

2    issue of probable cause for the warrantless search, it must file notice of its election within

3    four (4) days of the date of this order.

4         7.  The motion to suppress incriminating statements is DENIED IN PART AS

5    MOOT as to the statements made by defendant after Officer Williams initiated the search

6    of the Bentley, in light of the government's waiver of their admissibility, and DEFERRED

7    IN PART with respect to the statements made by defendant before the search of the car

8    (doc. no. 44).

9         Defendant's request for an evidentiary hearing is GRANTED with respect to the

10   limited issues of the language used by Officer Williams to summon defendant during the

11   traffic stop and the degree of pressure applied to defendant by Officer Williams during the

12   course of the detention, including the sequence of events and actions taken by, and

13   commands given by, Officer Williams.

14        8.  The court provides two alternative dates for the evidentiary hearing to

15   commence at 8:30 a.m. on either date: **Monday, March 14, 2016 or Friday, March 18,**

16   **2016.**  The parties shall meet and confer and advise the courtroom deputy which date

17   they prefer.  Each side must provide a list of witnesses it anticipates calling 14 days

18   before the hearing.  Three and a half (3.5) hours will be set aside for the proceeding.

19        **IT IS SO ORDERED.**

20   Dated:  February 18, 2016

21   _____

22   PHYLLIS J. HAMILTON
     United States District Judge

23

24

25

26

27

28