UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

LESHAWN LAWSON,

              Defendant.

Case No.  15-cr-00119-PJH-1

**ORDER DENYING DEFENDANT'S MOTIONS**

Doc. nos. 43, 44, 72

On March 18, 2016, this matter came on for an evidentiary hearing on the following issues raised by defendant LeShawn Lawson in his motion to suppress evidence obtained from the warrantless search and seizure of his person and vehicle, and his motion to suppress incriminating statements: what language Officer Williams used to summon defendant during the traffic stop, what degree of pressure Officer Williams applied to defendant during the course of the detention, and whether defendant consented to the search of his car.  Doc. nos. 43, 44.  The court previously ruled on other issues raised in those motions to suppress, as well as other motions filed by defendant. Doc. no. 62.  Prior to the evidentiary hearing, defendant filed a motion to suppress coerced statements for all purposes, which defense counsel asked to be construed as a motion in limine.  Doc. no. 72.  The parties timely filed post-hearing briefs, and the matter is fully submitted.

Having carefully considered the relevant legal authority, the parties' papers, the arguments of counsel, the witness testimony, and the evidence in the record, the court DENIES the pending motions to suppress for the reasons set forth below.

I.      **Motion to Suppress Evidence From Warrantless Search and Seizure**

Defendant seeks suppression of all the evidence seized from his person and from inside the Bentley, including evidence found in the trunk of the car, without a warrant on February 6, 2015.  The court previously found that the government did not establish probable cause to conduct the search, and the government did not proffer additional evidence to make a probable cause showing.  The government asserts that Officer Williams asked for and obtained defendant's consent to conduct the warrantless search of his person and his car.  Defendant denies that he consented to Officer Williams's search of his person or his vehicle.

A.      **Conflicting Testimony Whether Defendant Consented to the Search**

Both Officer Williams and defendant testified about the disputed issue whether defendant consented to the search of his person and car during the course of the traffic stop on February 6, 2015.

1.      **Officer Williams's Account**

Officer Williams testified that after he pulled over defendant's car, he asked defendant to roll down the back windows, which were tinted, because Officer Williams could not see if anyone was sitting in the back of the car.  Officer Williams also testified that he asked defendant for his driver's license, but did not ask defendant to turn over his keys at that time.  Officer Williams engaged in brief conversation, asking defendant where he was coming from, to which defendant answered he was driving from Los Angeles and had been there for three weeks.  Officer Williams stated in the arrest report that he asked defendant what he was doing in Los Angeles, and defendant answered that he works there as an entertainer at the clubs and that he works in the Bay Area as an iron worker.  Doc. no. 51, Ex. A-1 (arrest report).  Officer Williams testified that he made a remark that defendant didn't have much luggage, to which defendant responded by pointing to his Louis Vuitton duffle bag on the front passenger seat.  The arrest report reflects that defendant explained that he had been driving back and forth so he doesn't take too much with him.  Officer Williams testified that he commented on defendant's nice

2

United States District Court
Northern District of California

1    car, a Bentley, and defendant explained that the car was not really expensive and that he

2    was paying it off monthly.  The arrest report states that defendant told Officer Williams

3    that the Bentley was only a 2006 model and that he pays around $470 per month for it.

4    On cross-examination, Officer Williams defended the accuracy of his account and

5    testified that he made mental notes of his conversation with defendant, including

6    defendant's statement that he was paying $470 per month on the Bentley, before

7    preparing the arrest report later that day.

8         Officer Williams testified that during the course of his conversation with defendant,

9    Officer Williams asked defendant if he was on probation or parole and, as stated in the

10   arrest report, Officer Williams reported that defendant responded that he was not on

11   either and had not been in trouble in quite some time.  Officer Williams also testified that

12   he asked defendant if he had anything illegal, which defendant denied, as indicated in the

13   arrest report.

14        Officer Williams testified that he asked defendant if he could search, and

15   defendant said, "Go ahead," which Officer Williams understood as consent to search

16   defendant's person and his car.  Officer Williams then went back to the patrol car, asked

17   for cover, and then ran a background check on defendant.  Officer Williams testified that

18   when back-up arrived at the scene, he started to search defendant's car.  Officer Williams

19   testified that Officer Grejada responded to his request for back-up, and that Grejada

20   arrived at the scene before defendant exited the car; with respect to the timing of

21   Grejada's arrival, defense counsel pointed out that Officer Williams wrote in his arrest

22   report that "[a]s I was walking with Lawson to the sidewalk, Officer Grejada arrived on -

23   scene."

24        Officer Williams testified that he asked defendant to get out of the car and that he

25   searched defendant's person.  Officer Williams testified that he did not take the keys from

26   defendant when defendant got out of the car.  Officer Williams testified that the keys were

27   still inside the car at that point, and that he took the car keys after searching the interior of

28

1    the car.  According to Officer Williams, he saw the keys inside the car, but he did not

2    remember whether the keys were in the ignition.

3         Officer Williams testified that he asked defendant to sit on the curb, and defendant

4    complied.  Grejada was standing behind defendant.  Officer Williams testified that after

5    he searched the interior of the car, he was holding the car keys when he asked defendant

6    how to open the trunk.  According to Officer Williams, defendant told him that the trunk

7    release was in the glove compartment, but Officer Williams found the trunk release button

8    on the key fob.  Officer Williams did not recall asking defendant separately for consent to

9    search the trunk.  Officer Williams testified that he saw bricks, wrapped in green saran

10   wrap, in plain view in the trunk.

### 2.    Defendant's Testimony

12        Defendant waived his Fifth Amendment privilege for the limited purpose of

13   testifying on the issues raised by his motions to suppress.  On the issue of consent,

14   defendant testified at the outset that he never gave Officer Williams consent to search his

15   car or his person.  Defendant denied that Officer Williams ever asked for his consent to

16   search, and stated that he would be crazy to give consent.  Defendant opined that Officer

17   Williams knew that defendant would not cooperate, and testified that during the

18   encounter, lasting about 10 minutes, not once did Officer Williams ask for consent to

19   conduct the search.

20        Defendant denied other statements attributed to him by Officer Williams in the

21   arrest report or during testimony.  Defendant denied telling Officer Williams that he pays

22   $470 per month on the Bentley, noting that the discovery produced in this case indicates

23   that his car was paid off.  Defendant further denied having a conversation where he told

24   Officer Williams that he hasn't been in trouble for a long time.  Defendant also testified

25   that he did not discuss his employment with Officer Williams at the scene, but later in the

26   interview room at the police station.  Defendant denied telling Officer Williams that the

27   trunk release was in the glove box because the trunk release is on the driver-side door,

28   referring to photos of the Bentley left door handle.  Def. Exs. C and H.

Defendant also denied telling Officer Williams that there were "10 kilos" of cocaine in the trunk, but that statement was reportedly made after Officer Williams had started the search of the car and the government has conceded that statements made after the search will not be admitted at trial.

In describing the encounter, defendant testified that when he was pulled over, he saw a police car approach him from the right and the police officer yelled at him through the loudspeaker to instruct him where to pull over.  Defendant testified that he had his windows rolled up when he was stopped, and that, in his rear view mirror, he saw Officer Williams approach from the right bumper with his right hand on his gun.  Defendant testified that Officer Williams ordered him to roll all the windows down, turn off his engine, and give his ID and keys to Officer Williams.  Defendant testified that Officer Williams told him that if he's not doing anything wrong, there was nothing to worry about.  Defendant testified that Officer Williams talked on his radio, then came back to defendant's car to ask a few questions, then went back to his patrol car, and again came back to defendant's car.  Defendant also testified that he remained in the car when Officer Williams asked him questions and that Officer Williams had defendant's car keys. Defendant saw Officer Williams standing at the rear bumper of defendant's car and talking on his walkie before he ordered defendant to get out of the car.  According to defendant, Officer Williams asked defendant if he had anything that could poke him, then made defendant face his car, with fingers laced behind him, and searched him.

### 3.    Finding of Consent

Given the conflicting accounts of the traffic stop and the factual dispute whether defendant consented to Officer Williams's search of defendant's person and car, the court must make a credibility determination to accept either Officer Williams's account or defendant's denial that he gave consent.  At the outset, the court notes that both witnesses have a motive to lie.  Having heard the witnesses' testimony and evaluating their credibility based on consistency, demeanor in the courtroom, and corroboration with evidence in the record, the court finds that Officer Williams is more credible.  His

testimony was generally consistent with the statements contained in his arrest report, and his demeanor in court was calm and measured.  He appeared to answer questions honestly, based on his observations and experience, including the fact that the loudspeaker on his patrol car is loud enough to be heard inside a home.  He also admitted that when he took the keys from inside defendant's car, he did not remember whether he took the keys out of the ignition, and admitted that he never told defendant that he was free to leave during the traffic stop.

Defendant challenges Officer Williams's trustworthiness based on his failure to explain in the arrest report that the DEA asked Livermore Police to look for a white Bentley and that the traffic stop was pretextual.  However, the court noted at the hearing that the basis for the traffic stop was made part of the record and that the traffic stop was found to be valid in an earlier ruling.  As recent Ninth Circuit authority recognizes, a traffic stop is lawful so long as the facts known to the officer establish reasonable suspicion, "even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion."  *U.S. v. Magallon-Lopez*, --- F.3d ----, 2016 WL 1254033 at *3 (9th Cir. March 31, 2016).

Defendant challenges Officer Williams's credibility on other grounds.  First, that it would not be plausible that defendant would ever consent to a search, given his criminal history and experience with police.  Second, defense counsel argued that Officer Williams's testimony that he found the keys inside the car was not credible because he could not remember whether the keys were in the ignition or where the car keys were otherwise located.  Third, defense counsel pointed out the absence of corroborating evidence that defendant consented to the search or that Officer Williams told Officer Grejada, the second officer at the scene, that defendant gave consent, given that Officer Grejada did not testify.  The court does not find these grounds sufficient to wholly discredit Officer Williams in light of his demeanor in court, where he responded in a direct and straightforward manner, and his willingness to admit lapses in memory about details.

United States District Court
Northern District of California

The court finds that defendant's outright denial of consent and other aspects of his conversation with Officer Williams is not credible in light of defendant's demeanor when answering questions in court, where defendant demonstrated an eagerness to respond and explain himself, often talking over his attorney and even the court. In particular, defendant's assertion that Officer Williams never asked for his consent, that he would be crazy to give consent to a search of his car or his person, and that he knows better than to talk to the police given his past experience with law enforcement and his awareness of his right to withhold consent and to remain silent, is not credible in light of his ease of conversation in court, which was consistent with Officer Williams's description of the conversation in the police report. It is clear that, notwithstanding defendant's prior criminal history and awareness of his right to remain silent, defendant, consistent with his demeanor at the hearing, responded to Officer Williams's questions with some apparent ease rather than remain silent. It was apparent to the court that Officer Williams's speaking style is measured and conversational, which is also consistent with Officer Williams's style of questioning on the recording of the police station interview. Gov't Ex. A-4.

When Officer Williams was asked by defense counsel why he did not wait to see if defendant had a probation search condition before asking if he could search, Officer Williams testified that he has a practice of normally asking for consent to search. In light of the court's observations of Officer Williams's demeanor, it is entirely plausible that Officer Williams engaged defendant in conversation about where he was driving, about his work, his car, and his probation status, and then casually asked defendant if he could search. Though defendant adamantly insists that he never would have given consent, the court has observed both Officer Williams's and defendant's demeanor, and finds it highly likely that defendant responded as Officer Williams reported: "Go ahead, I don't have anything in my car," particularly knowing that he didn't have drugs on his person or in the cabin of the car. Even in court, defendant testified that the cash found in the

Bentley came from his show at the Supper Club, to demonstrate that he legally earned the money found in his possession.

The government argued that defendant's prior convictions for drug felonies are probative of his veracity, and pointed out that defendant filed a declaration erroneously stating that he recovered over $29,000 in cash seized during his Cincinnati arrest in October 2013, when records show that only $8,744 was returned to him. The court does not find that defendant's criminal history weighs heavily in assessing his credibility, since he was not convicted of crimes involving fraud or deceit. Nor does defendant's misunderstanding about the amount of cash that was seized in Cincinnati and forfeited to the government demonstrate falsehood.

The government did not offer defendant's recorded statements in the interrogation room after he was arrested to corroborate Officer Williams's account that defendant consented to the search, and the court does not rely on any of defendant's recorded statements during the police station interview for purposes of corroboration, having considered only Officer Williams's manner of questioning in the recorded interview. Accordingly, defendant's motion to suppress coerced statements for all purposes is DENIED as moot. Doc. no. 72.

Having taken the live testimony of Officer Williams and defendant, and in light of the record, the court finds that Officer Williams asked defendant for consent to search his person and his car and that defendant gave his consent.

## B.  Scope of Consent

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Defendant argues that even if he agreed to Officer Williams's request to search the inside of his car, the consent to search did not extend to the trunk of the car. As defendant concedes, it is well-established under Ninth Circuit authority that general consent to search a vehicle authorizes law enforcement to search

8

1  the passenger cabin, the trunk, and even under the hood.  *U.S. v. McWeeney*, 454 F.3d

2  1030, 1034 (9th Cir. 2006) (holding that general consent can include consent to search a

3  car's trunk, rejecting the defendant's argument that a reasonable person would not have

4  understood the officer's request to "look" in the car to include searching the trunk and

5  lifting the loose carpet liner) (citing *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir.

6  1994)); *United States v. Sierra-Hernandez*, 581 F.2d 760, 764 (9th Cir. 1978) (where the

7  defendant answered affirmatively to the agent's request to "look inside the truck," the

8  search of the cab, the back cargo portion, and under the hood was reasonable).

9        Defendant argues that if the court accepts Officer Williams's testimony, then the

10 totality of the circumstances indicates that any consent given by defendant would not

11 extend to the trunk because there was no expressed object of the search, and Officer

12 Williams himself did not understand the consent to include the trunk.  The evidence in the

13 record does not support defendant's arguments.  First, with respect to the object of the

14 search, the evidence shows that Officer Williams asked defendant if he had anything

15 illegal on him or in his vehicle, before asking defendant if he would mind if Officer

16 Williams searched him and his vehicle.  Arrest Report (doc. no. 51) at LAWSON-0031.

17 "The scope of a search is generally defined by its expressed object," *Jimeno*, 500 U.S. at

18 251.  The scope of consent is assessed under an objective reasonableness standard,

19 and is not based on the suspect's subjective understanding: "what would the typical

20 reasonable person have understood by the exchange between the officer and the

21 suspect?"  *Id.  See Schneckloth v. Bustamonte*, 412 U.S. 218, 234 (1973) (the suspect's

22 knowledge of his right to refuse is not a prerequisite of a voluntary consent).  Here,

23 Officer Williams expressed that he was looking for anything illegal, which the typical

24 reasonable person would understand as a search for contraband which would cover the

25 entire car, including the trunk.  *See McWeeney*, 454 F.3d at 1035 (where the officer

26 asked the suspects if they were in possession of anything "they were not supposed to

27 have," the reasonable person would reasonably assume that the officer was looking for

28

weapons and narcotics and would expect him to search the trunk and look under loose carpet).

Second, with respect to whether Officer Williams understood the consent to include the trunk, he testified that he understood defendant's response, "go ahead," as consent to search his person and his car.  In light of well-settled authority recognizing the scope of general consent to search of a car to include the trunk, absent some attempt to retract or narrow the consent, there is no basis in the record to limit Officer Williams's understanding of defendant's consent to exclude the trunk.  *See Sierra-Hernandez*, 581 F.2d at 764.  Defense counsel argues that Officer Williams characterized the search of the passenger cabin as "finished" before using the keys to open the trunk, suggesting that Officer Williams considered the search of the vehicle complete when he finished searching the cabin before moving on to the trunk.  Doc. no. 76 at 12.  This inference is not reasonable in light of Officer Williams's testimony and established authority governing the scope of consent.

Defendant further challenges Officer Williams's account that when he asked defendant how to open the trunk, defendant answered that he believed the trunk release was in the glove box, when the trunk release was actually on the key fob that Officer Williams was holding.  Defendant testified that he never said that the trunk release was in the glove box, referring to photos of the driver-side door handle where the trunk release is located.  Def. Exs. C, H.  The fact that the trunk release is not in the glove box does not discredit Officer Williams's account as "preposterous," given defendant's awareness that drugs would be found in the trunk and his motive to stall or prevent Officer Williams from searching the trunk.  There is no evidence that defendant objected to the search of the trunk or tried to modify or withdraw his earlier consent to the search.  Therefore, the search of the trunk remained within the boundaries of defendant's consent and the evidence obtained from the trunk is admissible.

Defendant also challenges the "absurdity" of Officer Williams's account that the duffle bag containing several bricks of cocaine was already open when he opened the

United States District Court
Northern District of California

1    trunk to conduct the search.  Doc. no. 76 at 13-14.  Defendant did not, however, testify to

2    the contrary, so there is no evidence to contradict Officer Williams's testimony and report

3    that the bricks, wrapped in green saran wrap, were in plain view.

4         Finally, defendant argues in the alternative that any consent to the search, if given,

5    was involuntary because the traffic stop escalated to an impermissible seizure.  Doc. no.

6    76 at 5-9.  As discussed further below with respect to defendant's contention that the

7    traffic stop amounted to a custodial interrogation, the encounter was a routine traffic stop,

8    at least during the relevant interval leading up to the search, and was not custodial or

9    coercive in nature.  *See U.S. v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) (the defendant

10   voluntarily consented to search of his car where there was no evidence to suggest that

11   the officer's conduct was coercive, given that the officer did not draw his gun, use force,

12   or handcuff the defendant, and did not imply that he had the authority to search with or

13   without the defendant's consent).  Defendant's challenge to the consent as involuntary

14   therefore lacks support in the record.

15        Because the search was conducted pursuant to valid consent, defendant's motion

16   to suppress evidence obtained from the warrantless search of his person and his car is

17   DENIED.

18   **II.    Motion to Suppress Incriminating Statements**

19        Defendant moves to suppress all statements attributed to him at the scene of the

20   traffic stop.  Under Ninth Circuit authority, five factors are relevant to the custody

21   determination: (1) the language used to summon the individual; (2) the extent to which

22   the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

23   interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to

24   detain the individual.  *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009)

25   (quoting *United States v. Kim*, 292 F.3d 969, 974 (2002)).  As limited by the earlier ruling

26   on defendant's motions to suppress, the evidentiary hearing was held to determine

27   (a) the language Officer Williams used to summon defendant during the traffic stop, and

28   (b) the degree of pressure Officer Williams applied to defendant during the course of the

United States District Court
Northern District of California

detention, to assess whether defendant was in custody at the time he made his statements to Officer Williams.  Doc. no. 62 at 52-59.

With respect to the language used to summon defendant, Officer Williams admittedly used the loudspeaker on his patrol car to pull over defendant's car.  Defendant testified that Officer Williams yelled through the loudspeaker, telling him to "keep going, keep going," when defendant tried to pull over to the shoulder, and ordered defendant to pull off the freeway.  When defendant started to turn right on the exit ramp, Officer Williams ordered him to turn left, correcting defendant when he tried to comply with orders to pull over.  The use of a loudspeaker, by itself, does not add a coercive or custodial element to the traffic stop, given that defendant was driving on a freeway when he was pulled over, and there is nothing unusual about a police officer's use of a loudspeaker to conduct a traffic stop and getting off the freeway for a safer location.  The testimony shows that defendant was stopped at an intersection in front of a gas station, near motels and a strip mall.

Officer Williams also explained that after pulling over defendant's car, he directed defendant to roll down the rear windows because the windows were tinted and he could not see if there were passengers in the back seat.  Officer Williams was alone when conducting the initial encounter, and defendant does not demonstrate that Officer Williams used particularly coercive language in pulling over defendant.  "Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody."  *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981).

With respect to the degree of pressure, the witnesses disputed whether Officer Williams had his hand on his gun when he approached defendant's car.  Defendant testified that he saw Officer Williams in his rear view mirror with his hand on his gun, but did not indicate that he directly saw Officer Williams with his hand on his gun or holster, nor indicate when Officer Williams removed his hand from his gun.  On the contrary, Officer Williams testified that he did not have his hand on his gun when he approached

defendant's car.  Defense counsel argued that Officer Williams was aware that defendant was a suspected drug dealer and would have kept his hand on his gun out of concern for his own safety.  However, Officer Williams did not articulate any fear for his safety or suspicion that defendant would be armed and dangerous.  Consistent with a lack of heightened concern for his immediate safety, when conducting the search of defendant's person, Officer Williams reported it as a consent search, not a pat-down for weapons.  In light of the evidence, and the court's determination that Officer Williams is a credible witness, the court finds that Officer Williams did not approach defendant with his hand on his gun.

The witnesses also disputed whether Officer Williams took defendant's keys when defendant handed over his driver's license, with defendant testifying that when Officer Williams approached defendant's car, he ordered defendant to roll down the windows, turn off the engine, and hand over his ID and keys.  Defendant testified that he gave his keys to Officer Williams, whereas Officer Williams testified that he found the keys inside the car after searching the interior of the car, although he could not remember if the keys were still in the ignition when he found them.  The evidence does not suggest that Officer Williams would have had a motive to confiscate defendant's keys at the outset of the traffic stop, given defendant's compliance with the instructions to pull over, Officer Williams's report to dispatch that he was conducting a "no plate" and giving the location of the traffic stop, and Officer Williams's initiation of a probation check with defendant's driver's license about 4 minutes into the traffic stop.  Def. Ex. W (partial transcript of dispatch recording).  Because the court found Officer Williams to be more credible than defendant, the court accepts Officer Williams's testimony that he did not order defendant to hand over his keys at the outset of the traffic stop, but only asked for defendant's driver's license, and found the keys inside the car after obtaining defendant's consent to search.

In light of the evidence that Officer Williams did not use strong language beyond a typical traffic stop and did not apply an unusual degree of pressure to conduct the traffic

stop such as drawing his gun, using physical force or handcuffing defendant, that Officer Williams was alone when he questioned defendant and the traffic stop was conducted at a populated intersection off the freeway in Livermore, that Officer Williams did not challenge defendant's statements with facts suggesting guilt during the interrogation, and that the questioning was not unreasonably prolonged, the court finds that defendant was not in custody when he was being questioned by Officer Williams up to the search of defendant's person and his car.  Accordingly, defendant's motion to suppress incriminating statements is DENIED.

## CONCLUSION

For the reasons set forth above, defendant's motion to suppress evidence obtained from the warrantless search and seizure of his person and vehicle, and his motions to suppress incriminating statements and coerced statements are DENIED. Doc. nos. 43, 44, 72.

Given that this order re-starts the speedy trial clock, the parties shall contact the courtroom deputy to set the matter for status and trial setting on either April 20 or April 27, 2016, at 1:30 p.m.

**IT IS SO ORDERED.**

Dated:  April 14, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge